**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

**WOLLMUTH MAHER & DEUTSCH LLP**
Paul R. DeFilippo, Esq.
500 Fifth Avenue
New York, New York 10110
Telephone: (212) 382-3300
Facsimile: (212) 382-0050
pdefilippo@wmd-law.com

**JONES DAY**
Gregory M. Gordon, Esq.
Brad B. Erens, Esq.
Dan B. Prieto, Esq.
Amanda Rush, Esq.
2727 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 220-3939
Facsimile: (214) 969-5100
gmgordon@jonesday.com
bberens@jonesday.com
dbprieto@jonesday.com
asrush@jonesday.com
(Admitted *pro hac vice*)

*ATTORNEYS FOR DEBTOR*

| | |
|---|---|
| In re:<br><br>LTL MANAGEMENT LLC,[1]<br><br>　　　　　　　Debtor. | Chapter 11<br><br>Case No.:  21-30589 (MBK)<br><br>Judge:  Michael B. Kaplan |

---

[1]　　　The last four digits of the Debtor's taxpayer identification number are 6622.  The Debtor's address is 501 George Street, New Brunswick, New Jersey 08933.

| LTL MANAGEMENT LLC, | |
|---|---|
| Plaintiff, | |
| v. | Adv. Proc. No. 22-01073 (MBK) |
| SAN DIEGO COUNTY EMPLOYEES RETIREMENT ASSOCIATION, Individually and on Behalf of All Others Similarly Situated, | |
| Defendants. | |

**DEBTOR'S MOTION FOR AN ORDER (I) PRELIMINARILY ENJOINING THE PROSECUTION OF PUTATIVE SECURITIES CLASS ACTION AND (II) GRANTING A TEMPORARY RESTRAINING ORDER PENDING A FURTHER HEARING**

--

# TABLE OF CONTENTS

**Page**

NATURE OF PROCEEDING .................................................................................... 1

JURISDICTION AND VENUE ................................................................................. 4

SUMMARY OF ARGUMENT .................................................................................. 5

    A.    Ample Justification Exists to Enjoin the Securities Action .................................. 5

    B.    A Temporary Restraining Order and Expedited Hearing Are Appropriate ........... 9

FACTUAL BACKGROUND ...................................................................................... 9

    Corporate History and 2021 Restructuring .................................................... 10

    The Debtor's Talc Claims and Decision to File for Chapter 11 Reorganization ............. 12

    The Talc Claim Temporary Restraining Order and Preliminary Injunction ................... 14

    The Securities Claims Asserted by the Securities Claimants .......................... 16

ARGUMENT ............................................................................................................ 18

I.    THE COURT HAS SUBJECT MATTER JURISDICTION ........................................... 18

    A.    The Court Has Both "Arising Under" and "Arising In" Jurisdiction to
Grant Relief that Ensures the Effectiveness of the Automatic Stay and that
Would Have No Existence Outside of Bankruptcy ............................................... 19

    B.    The Court Also Has "Related to" Jurisdiction Over the Securities Action ......... 20

II.    THE COURT SHOULD EXERCISE ITS AUTHORITY UNDER
SECTION 105(A) TO ENJOIN THE SECURITIES CLAIMANTS'
CONTINUED PROSECUTION OF THE SECURITIES CLAIMS .............................. 21

        1.    The Debtor Has a Realistic Possibility of a Successful
Reorganization ........................................................................................ 24

        2.    The Debtor Will Be Irreparably Harmed Unless the Injunction
Issues ..................................................................................................... 26

        3.    The Balance of Harms Weighs Heavily in Favor of Issuance of the
Preliminary Injunction ............................................................................ 32

        4.    The Public Interest Supports Issuing the Injunction ................................ 33

III.    THE COURT SHOULD GRANT A TEMPORARY RESTRAINING ORDER
TO PROMPTLY EFFECTUATE THE RELIEF SOUGHT BY THE DEBTOR ........... 35

CONCLUSION ......................................................................................................... 37

## TABLE OF AUTHORITIES

**Page**

CASES

*A.H. Robins Co. v. Piccinin*,
788 F.2d 994 (4th Cir. 1986) .................................................................5, 21, 22, 23

*Dunaway v. Purdue Pharm. L.P. (In re Purdue Pharm. L.P.)*,
619 B.R. 38 (S.D.N.Y. 2020)............................................................................23, 27

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005)...................................................................................................16

*Gold v. Ford Motor Co.*,
577 F. App'x 120 (3d Cir. 2014) ..............................................................................16

*Hall v. Johnson & Johnson*,
No. 3:18-cv-01833, 2019 WL 7207491 (D.N.J. Dec. 27, 2019) ......................17, 31

*Hall v. Johnson & Johnson*,
No. 3:18-cv-01833-FLW-TJB (D.N.J.) ......................................................................1

*In re Am. Film Techs., Inc.*,
175 B.R. 847 (Bankr. D. Del. 1994) ........................................................................22

*In re Bestwall*,
606 B.R. 243 (Bankr. W.D.N.C. 2019)...............................................20, 24, 29, 33

*In re Brier Creek Corp.*,
486 B.R. 681 (Bankr. E.D.N.C. 2013) ......................................................................20

*In re DBMP LLC*,
No. 20-30080, 2021 WL 3552350 (W.D.N.C. Aug. 11, 2021) ...................... passim

*In re E. Orange Gen. Hosp., Inc.*,
587 B.R. 53 (D.N.J. 2018) .........................................................................................19

*In re Family Health Servs., Inc.*,
105 B.R. 937 (Bankr. C.D. Cal. 1989)......................................................................22

*In re Fed-Mogul Glob., Inc.*,
684 F.3d 355 (3d Cir. 2012)......................................................................................25

*In re FPSDA I, LLC*,
   No. 10-75439, 2012 WL 6681794 (Bankr. E.D.N.Y. Dec. 21, 2012) ....................................19

*In re G-I Holdings Inc.*,
   420 B.R. 216 (Bankr. D.N.J. 2009) .........................................................................................24

*In re G-I Holdings, Inc.* (*G-I Holdings I*),
   580 B.R. 388 (Bankr. D.N.J. 2018) .........................................................................................20

*In re Gander Partners LLC*,
   432 B.R. 781 (Bankr. N.D. Ill. 2010) ......................................................................................34

*In re Heron, Burchette, Ruckert & Rothwell*,
   148 B.R. 660 (Bankr. D.D.C. 1992) .........................................................................................22

*In re Integrated Health Servs., Inc.*,
   281 B.R. 231 (D. Del. 2002).................................................................................................8, 34

*In re Johns-Manville Corp.* (*Johns-Manville II*),
   40 B.R. 219 (S.D.N.Y. 1984)...................................................................................................29

*In re Johns-Manville* (*Johns-Manville I*),
   26 B.R. 420 (Bankr. S.D.N.Y. 1983) .......................................................................................22

*In re Lyondell Chem. Co.*,
   402 B.R. 571 (Bankr. S.D.N.Y. 2009)......................................................................................22

*In re Monroe Well Serv., Inc.*,
   67 B.R. 746 (Bankr. E.D. Pa. 1986) ........................................................................................20

*In re Myerson & Kuhn*,
   121 B.R. 145 (Bankr. S.D.N.Y. 1990)......................................................................................22

*In re Purdue Pharma L.P.*,
   No. 19-23649, Adv. No. 19-08289 (Bankr. S.D.N.Y. Oct. 11, 2019) *aff'd* 619
   B.R. 38 (S.D.N.Y. 2020)...........................................................................................................22

*In re Saxby's Coffee Worldwide, LLC*,
   440 B.R. 369 (Bankr. E.D. Pa. 2009) ................................................................................33, 34

*In re TK Holdings Inc.*,
   Case No. 17-50880, Adv. No. 17-50880 (Bankr. D. Del. Aug. 22, 2017) ..............................22

*In re Union Trust Phila., LLC* (*Union Trust II*),
    460 B.R. 644 (E.D. Pa. 2011) ........................................................................23, 24

*In re USA Gymnastics*,
    No. 18-09108, Adv. No. 19-50075 (Bankr. S.D. Ind. Apr. 22, 2019) ....................................22

*In re W.R. Grace & Co.*,
    115 F. App'x 565 (3d Cir. 2004) .................................................................. passim

*In re W.R. Grace & Co.*,
    591 F.3d 164 (3d Cir. 2009)........................................................................19

*Institutional Invs. Grp. v. Avaya, Inc.*,
    564 F.3d 242 (3d Cir. 2009)........................................................................16

*Mallinckrodt PLC v. Conn. (In re Mallinckrodt PLC)*,
    No. 20-408, 2021 WL 523625 (D. Del. Feb. 11, 2021)........................................................27

*P.C. Yonkers, Inc. v. Celebrations the Party & Seasonal Superstore, LLC*,
    428 F.3d 504 (3d Cir. 2005)........................................................................24

*Pacor, Inc. v. Higgins*,
    743 F.2d 984 (3d Cir. 1984)........................................................................20

*Roggio v. Roggio (In re Roggio)*,
    612 B.R. 655 (Bankr. M.D. Pa. 2020) ....................................................................19

*Stoe v. Flaherty*,
    436 F.3d 209 (3d Cir. 2006)........................................................................19

*TK Holdings Inc. v. State of Hawai'i (In re TK Holdings Inc.)*,
    No. 17-11375, Adv. Pro. No. 17-50880 (Bankr. D. Del. Aug. 22, 2017)..............................23

*W.R. Grace & Co. v. Chakarian (In re W.R. Grace & Co.)*,
    386 B.R. 17 (Bankr. D. Del. 2008) .......................................................22, 27, 29, 34

*W.R. Grace & Co. v. Chakarian (In re W.R. Grace & Co.)*,
    No. 01-01139, 2004 WL 954772 (D. Del. Apr. 29, 2004)........................................................27

## STATUTES

11 U.S.C. § 105 .................................................................................................... passim

11 U.S.C. § 362 ........................................................................................................19

11 U.S.C. § 1107 ......................................................................................................10

11 U.S.C. § 1108 ......................................................................................................10

15 U.S.C. § 78t(a) ....................................................................................................16

28 U.S.C. §§ 157 ........................................................................................................4

28 U.S.C. § 1334 ...................................................................................................4, 18

28 U.S.C. § 1409 ........................................................................................................4

Private Securities Litigation Reform Act of 1995 ...................................................2

Securities Exchange Act of 1934 .................................................................2, 16, 17

## OTHER AUTHORITIES

17 C.F.R. § 240.10b-5 ...............................................................................2, 16, 17

Fed. R. Bankr. P. 7001 ..............................................................................................1

Fed. R. Bankr. P. 7008 ..............................................................................................4

Fed. R. Bankr. P. 7065 ..........................................................................................1, 36

Fed. R. Civ. P. 65 ...............................................................................................35-38

13 James Wm. Moore et al., *Moore's Federal Practice – Civil* § 65.31 (3d ed.
2021) .........................................................................................................................36

*Mass Tort Bankruptcy Cases*, Federal Judicial Center 1 (2005),
https://www.fjc.gov/sites/default/files/2012/GibsJudi.pdf ......................................25

## <u>NATURE OF PROCEEDING</u>

Pursuant to Rules 7001(7), 7001(9) and 7065 of the Federal Rules of Bankruptcy

Procedure (the "<u>Bankruptcy Rules</u>") Plaintiff LTL Management LLC (the "<u>Debtor</u>"), the debtor

in the above-captioned chapter 11 case (the "<u>Chapter 11 Case</u>"), seeks an order of the Court

temporarily enjoining the continued prosecution of *Hall v. Johnson & Johnson*,

No. 3:18-cv-01833-FLW-TJB (D.N.J.) (the "<u>Securities Action</u>"), a securities action pending in

the United States District Court for the District of New Jersey (the "<u>District Court</u>"), against

certain non-debtor individuals and affiliates of the Debtor (the "<u>Third-Party Securities

Defendants</u>") while the Chapter 11 Case remains pending.[1]

A fundamental dispute in the Chapter 11 Case relates to the alleged merits of the

Talc Claims against the Debtor.  The Debtor and the Third-Party Securities Defendants maintain

that cosmetic talc products manufactured or distributed by the Debtor's predecessors or Johnson

& Johnson ("<u>J&J</u>") are safe, did not contain asbestos, and do not cause disease (and that public

statements to that effect were truthful and made in good faith).  By contrast, the talc claimants

allege that such talc products contained asbestos and cause mesothelioma or ovarian cancer.

This dispute about the safety of cosmetic talc products is also central to the claims asserted in the

Securities Action.  In fact, a critical element of those claims is whether cosmetic talc products are

safe.  Thus, if the Securities Action is permitted to continue, a key issue in the Chapter 11 Case

will be adjudicated outside of this Court at the same time that parties in the Chapter 11 Case are

attempting to resolve that very dispute and formulate a consensual plan of reorganization.

---

[1]     The Debtor recognizes that the Court has determined to review the existing preliminary injunction
(described below) on June 29, 2022 and every four months thereafter and would not oppose a similar
periodic review of any preliminary injunction issued with respect to the Securities Action.

The defendants in this adversary proceeding (collectively, the "Securities

Claimants") are members of a putative plaintiff class in the Securities Action consisting of

individuals who purchased J&J stock during the period from February 22, 2013, through

December 13, 2018.  Compl., App. B (Amended Complaint from the Securities Action).[2]  The

Third-Party Securities Defendants in the Securities Action are:  (i) Johnson & Johnson ("J&J");

(ii) Alex Gorsky, Executive Chairman of J&J; and (iii) Carol Goodrich, Joan Casalvieri, Ph.D.

and Tara Glasgow, all three of whom are former employees of Old JJCI, the Debtor's

predecessor.  *Id.*

In the Securities Action, the Securities Claimants assert violations by the

Third-Party Securities Defendants of section 10(b) of the Securities Exchange Act of 1934

(the "Exchange Act"), the Securities and Exchange Commission's implementing regulation,

Rule 10b-5, and section 20(a) of the Exchange Act (collectively, the "Securities Claims").  *Id.*

All of the Securities Claims, however, are based ultimately on the disputed allegation that talc

products manufactured and/or distributed by the Debtor's predecessors or J&J were

contaminated with asbestos or otherwise may cause injury.  These allegations create substantial

factual overlap with the claims at issue (collectively, the "Talc Claims") here.[3]  Proving these

allegations in the Securities Action will thus directly implicate the Debtor's ability to resolve the

Talc Claims in the Chapter 11 Case.  Indeed, the continued prosecution of the Securities Action

---

[2]  No class has yet been certified in the Securities Action.  *See* Kim Decl. ¶¶ 6, 15.  San Diego County
Employees Retirement Association was appointed lead plaintiff pursuant to the Private Securities Litigation
Reform Act of 1995.

[3]  Talc Claims include all claims relating in any way to talc or talc-containing materials that formerly were
asserted against (or that could have been asserted against) former Johnson & Johnson Consumer, Inc. ("Old
JJCI") on any theory of liability (whether direct, derivative, joint and several, successor liability, vicarious
liability, fraudulent or voidable transfer or conveyance, alter ego or otherwise).

would interfere with or impact the valuation of the Talc Claims in upcoming settlement

negotiations and in any claims estimation proceeding.

The Securities Claimants have recently eliminated any doubt that the Securities

Action and the Chapter 11 Case are intertwined and that the continued prosecution of the

Securities Action will cause the Debtor irreparable harm.  In a February 23, 2022 letter

concerning discovery in the Securities Action, the Securities Claimants explained that "the

underlying issues surrounding the Texas Two-Step bankruptcy are highly relevant to the claims

and defenses at issue" in the Securities Action.  Ex. 1 (Securities Claimants' Counsel's Feb. 23,

2022 Letter to John M. Skakun III) at 3.  And they noted that "the bankruptcy arose out of the

same transaction as the fraudulent scheme alleged in the [Securities] [A]ction" and "concerns a

critical development that is part of the complete story of the alleged omissions and false

statements at issue" there.  *Id.*  Other actions of the Securities Claimants, including their

discovery requests, underscore that issues at the heart of the Debtor's Chapter 11 Case are

pivotal to the Securities Claimants' strategy and pursuit of discovery in the Securities Action.

Given these recent developments, the Debtor requests that the Court issue a

preliminary injunction under section 105(a) of title 11 of the United States Code

(the "Bankruptcy Code") temporarily enjoining the Securities Claimants from prosecuting the

Securities Action against the Third-Party Securities Defendants because it is inextricably

intertwined with the Talc Claims that the Debtor seeks to equitably resolve in the Chapter 11

Case.  And because fact discovery is continuing and includes three depositions of the Third-Party

Securities Defendants' witnesses that are scheduled shortly, the Debtor additionally seeks a

temporary restraining order following an expedited, emergency hearing to promptly effectuate

the requested relief on an interim basis pending a further hearing on this Motion.

Unlike several other similarly situated parties—including, for example, the state attorneys general described below whose claims likewise are predicated on purported false representations as to the safety of talc—the Securities Claimants have indicated that they do not consent to a voluntary stay of the Securities Action.  The Debtor, therefore, must seek the requested relief to avoid immediate harm to its reorganization efforts.

Along with this Motion, the Debtor has filed the *Debtor's Verified Complaint for Injunctive Relief (I) Preliminarily Enjoining the Prosecution of Putative Securities Class Action and (II) Granting a Temporary Restraining Order Pending a Final Hearing* (the "Complaint") that initiated this adversary proceeding.  In support of this Motion, the Debtor incorporates: (i) the *Declaration of John K. Kim in Support of First Day Pleadings*, No. 21-30589, ECF No. 5 (the "First Day Declaration"), filed earlier in the Chapter 11 Case and attached as Exhibit 2; (ii) the *Supplemental Declaration of John K. Kim in Support of Debtor's Complaint for Declaratory and Injunctive Relief and Related Motions*, Adv. Pro. No. 21-03032, ECF No. 3 (together with the First Day Declaration, the Prior Declarations"), filed earlier in the Chapter 11 Case and attached as Exhibit 3; and (iii) the *Declaration of John K. Kim in Support of Debtor's Complaint for Injunctive Relief and Related Motion With Respect to Putative Securities Class Action* (the "Kim Declaration"), filed contemporaneously herewith.

## JURISDICTION AND VENUE

This Court has subject matter jurisdiction over this adversary proceeding and this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Pursuant to Bankruptcy Rule 7008, the Debtor consents to the entry of final orders or a final judgment by this Court in this adversary proceeding.  Venue is proper in this District pursuant to 28 U.S.C. § 1409.

## SUMMARY OF ARGUMENT

### A.    Ample Justification Exists to Enjoin the Securities Action

Many of the same principles underpinning this Court's recent decision to stay and enjoin the Talc Claims against third-party defendants also support enjoining the Securities Action.  Both sets of claims involve much of the same evidence and turn on many of the same issues.  The Talc Claims allege that exposure to talc is harmful either because talc is dangerous in and of itself or the talc used by Old JJCI is contaminated with asbestos.  Similarly, the Securities Claims allege that J&J and certain individuals made false or misleading statements about the safety of talc, including alleged contamination of the talc with asbestos.  The essential allegations of the Talc Claims and Securities Claims are thus virtually identical:  that Old JJCI's and J&J's talc products were contaminated with asbestos or were otherwise harmful.

Litigation of the Securities Action could impact the Debtor's reorganization efforts by creating "an evidentiary record that prejudices the Debtor."  *In re DBMP LLC*, No. 20-30080, 2021 WL 3552350, at *27 (W.D.N.C. Aug. 11, 2021).  To prove their claims, the Securities Claimants must present evidence to establish that Old JJCI's and J&J's talc products are harmful.  These efforts would directly impact the Talc Claims asserted against the Debtor, and, as a result, interfere with the Debtor's ability to resolve them equitably and efficiently in the Chapter 11 Case.  The Debtor has a direct stake in the evidence developed and rulings reached in the Securities Action; the Court should enjoin its prosecution.

Section 105(a) of the Bankruptcy Code empowers the Court "'to enjoin parties other than the bankrupt' from commencing or continuing litigation" that threatens to "interfere in the rehabilitative process whether in a liquidation or in a reorganization case."  *A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 1002-03 (4th Cir. 1986) (quoting *In re Otero Mills, Inc.*, 25 B.R. 1018, 1020 (D.N.M. 1982)).  Assessing whether injunctive relief is proper turns on the four familiar

preliminary injunction factors, modified to fit the bankruptcy context.  The Debtor has satisfied

each one.

First, the Debtor has already demonstrated that it has a realistic possibility of

successfully reorganizing.  *See* N.J. Mem. Op. at 47-48.  The Debtor is well capitalized and has

access to funds to satisfy its talc liability.  It is thus well positioned to resolve the Talc Claims

through confirmation of a plan of reorganization.

Second, the Debtor will be irreparably harmed without an injunction.  Whether

irreparable harm exists depends on "whether the litigation 'could interfere with the

reorganization of the debtor' or 'would interfere with, deplete or adversely affect property of

[the] estates or which would frustrate the statutory scheme of chapter 11 or diminish [the

debtor's] ability to formulate a plan of reorganization.'"  *In re W.R. Grace & Co.*, 115 F. App'x

565, 570 (3d Cir. 2004) (first quoting *Oberg v. Aetna Cas. & Sur. Co.* (*In re A.H. Robins Co.*),

828 F.2d 1023, 1025 (4th Cir. 1987), then quoting *In re Johns-Manville* (*Johns-Manville I*),

26 B.R. 420, 436 (Bankr. S.D.N.Y. 1983)); *see also Aldrich Pump*, 2021 WL 3729335, at *33

("[T]he critical, if not decisive, issue over whether injunctive relief should be granted is whether

and to what extent the non-debtor litigation interferes with the debtors' reorganization efforts."

(quoting *In re Brier Creek Corp.*, 486 B.R. 681, 694 (Bankr. E.D.N.C. 2013))).

The Talc Claims and Securities Claims are intimately intertwined, and continuing

to litigate the Securities Claims could create a record and adjudicate issues that would materially

prejudice the Debtor's ability to achieve a successful reorganization.  The Securities Claimants

cannot prove their claims without first proving that Old JJCI's and J&J's talc products were

contaminated with asbestos or were otherwise harmful—the essence of the Talc Claims.

The Securities Claimants admit this overlap, highlighting that "the underlying issues" in the

Debtor's Chapter 11 case "are highly relevant to the claims and defenses at issue" in their case.

Ex. 1 (Third-Party Securities Defendants' Counsel's Feb. 23, 2022 Letter to John M. Skakun III)

at 3.  Indeed, they label the Chapter 11 Case "a critical development that is part of the complete

story of the alleged omissions and false statements" in the Securities Action because "the

bankruptcy arose out of the same transaction as the fraudulent scheme" they allege to have

occurred.  *Id.*  This overlap now guides the Securities Claimants' discovery strategy—with the

Securities Claimants recently targeting information concerning the Debtor's prepetition

restructuring in their requests.  *See* Ex. 9 (Defs.' Objs. & Resps. to Pl.'s 4th Set of RFPs)

(requesting, for example, "all documents concerning J&J's decision to execute the Texas Two

Step").  This is in addition to prior discovery that requested information concerning the core of

the merits of the Talc Claims.  *See* Exs. 6–8.  As the Securities Claimants' words and actions

make clear, the two actions are inextricably intertwined.  Permitting the continued prosecution of

their claims thus "would undermine the purposes of chapter 11 and section 524(g) to resolve all

such current and future claims in a fair and equitable manner through a chapter 11 plan."

*DBMP*, 2021 WL 3552350, at *41.

            This Court's rationale for finding irreparable harm from failing to stay the Talc

Claims applies fully here:  "continued litigation will have an adverse impact on the bankruptcy

estate, will hinder reorganization efforts, and will serve as a constant drain on resources and

time."  N.J. Mem. Op. at 48.  In addition, as this Court emphasized, "it is possible that the

evidentiary record developed in continued litigation against the Protected Parties could prejudice

the Debtor—especially considering that Debtor would be absent from the continued litigation."

*Id.* at 41; *see also* W.D.N.C. Prelim. Inj. Order at 5-6 ("Statements, testimony and other evidence

generated in litigation of Debtor Talc Claims against the Protected Parties could be used to try to

establish the Debtor's own liability for the exact same talc-related claims."). The risk that

litigation against the Third-Party Securities Defendants could result in adverse consequences for

the Debtor, including this record taint, supports an injunction of the Securities Action.

Third, the balance of harms weighs in favor of injunctive relief. Should the

Securities Claims proceed, the Debtor will face the potentially substantial harm of an evidentiary

record that impacts the Talc Claims and efforts to resolve the Chapter 11 Case. On the other

hand, the Securities Action would only be temporarily paused while the Debtor seeks to

reorganize—a pause that is unlikely to impose much, if any, harm on the Securities Claimants,

none of whom have suffered bodily injury. And, if the Court follows its ruling with respect to

the existing preliminary injunction, that pause will be subject to review every four months.

As with the Talc Claims, "[d]elay, in and of itself, is insufficient to overcome irreparable harm

caused to the Debtor and its estate." W.D.N.C. Prelim. Inj. Order at 6. The balance of the harms

thus likewise favors injunctive relief.

Finally, the public interest also favors a preliminary injunction by promoting a

successful resolution of the myriad Talc Claims. "In the context of a bankruptcy case, promoting

a successful reorganization is one of the most important public interests," *In re Integrated Health

Servs., Inc.*, 281 B.R. 231, 239 (D. Del. 2002), and injunctive relief here would do so. The Court

has already found that the Debtor filed the Chapter 11 Case in good faith and with the valid

reorganizational purpose "of addressing the present and future liabilities associated with ongoing

global personal injury claims to preserve corporate value." N.J. Mem. Op. at 16. Such relief

would ensure that the Debtor is best positioned to "efficiently and equitably resolve tens of

thousands" of tort claims. *DBMP*, 2021 WL 3552350, at *42. And, as this Court already stated,

it "holds no doubts that claim resolution through the bankruptcy process is in the public interest."

N.J. Mem. Op. at 50; *see also* W.D.N.C. Prelim. Inj. Order at 6 ("The public interest lies with the Debtor completing its reorganization process and resolving the Debtor Talc Claims in a uniform and equitable manner.").

### B.    A Temporary Restraining Order and Expedited Hearing Are Appropriate

In light of the latest developments in the Securities Action, the Debtor also asks that the Court enter a temporary restraining order following an expedited, emergency hearing to enjoin the Securities Claimants from prosecuting the Securities Claims.  Doing so would preserve the status quo until this Court is able to hold a further hearing on the Debtor's requested relief.  For all the same reasons that issuance of a preliminary injunction is justified, a prompt TRO is warranted too.  Allowing the continued prosecution of the Securities Claims while the Court considers this request would risk the same sort of immediate and irreparable harm that denying this request would cause.  And given the short duration of a TRO to preserve the status quo, there would be no harm to the Securities Claimants.  Such relief is thus proper, and the Court should issue it.

### FACTUAL BACKGROUND

Because the Court is familiar with the Debtor's circumstances, an abbreviated version of the facts is provided below.  A longer recitation of the factual background is available in the Debtor's earlier filings, including:  the *Informational Brief of LTL Management LLC*, No. 21-30589, ECF No. 3; the First Day Declaration; and the *Complaint for Declaratory and Injunctive Relief (I) Declaring that the Automatic Stay Applies to Certain Actions Against Non-Debtors or, (II) Preliminarily Enjoining Such Actions and (III) Granting a Temporary Restraining Order Pending a Final Hearing*, Adv. Pro. No. 21-03032, ECF No. 1.

*         *         *

On October 14, 2021 (the "Petition Date"), the Debtor commenced the Chapter 11

Case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the U.S.

Bankruptcy Court for the Western District of North Carolina ("N.C. Bankruptcy Court").

On November 16, 2021, the N.C. Bankruptcy Court transferred the Chapter 11 Case to the

District Court, which referred the Chapter 11 Case to this Court.  *See* No. 21-30589, ECF

No. 416.  The Debtor is continuing in possession of its property and is managing its business, as

a debtor in possession, pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

## Corporate History and 2021 Restructuring

On October 12, 2021, Old JJCI implemented the corporate restructuring described

in detail in the First Day Declaration (the "2021 Corporate Restructuring").  First Day Decl. ¶ 16.

As a result of that restructuring, Old JJCI ceased to exist, and two new entities were created:

(i) the Debtor, which was initially formed as a Texas limited liability company and then

converted into a North Carolina limited liability company; and (ii) a second entity, which was

initially formed as a Texas limited liability company and then merged into a New Jersey

corporation that was its direct parent (as well as the direct parent of the Debtor), whereupon this

entity changed its name to "Johnson & Johnson Consumer Inc." ("New JJCI").  *Id.*

New JJCI manufactures and sells a broad range of products used in the baby care,

beauty, oral care, wound care and women's health-care fields, as well as over-the-counter

pharmaceutical products. *Id.* ¶ 19.  The Debtor's ultimate parent company, J&J, is a holding

company that, through its operating subsidiaries, conducts business in virtually all countries in

the world, focused primarily on products related to human health and well-being.  *Id.*

Old JJCI and its affiliates have engaged in multiple restructurings through the

years to achieve business and operational objectives.  *Id.* ¶ 20.  The 2021 Corporate

Restructuring was implemented to enable the Debtor to fully resolve Talc Claims through a

chapter 11 reorganization without subjecting the entire Old JJCI enterprise to a bankruptcy

proceeding. *Id.* ¶ 21.

As a result of the 2021 Corporate Restructuring:

a) Old JJCI ceased to exist;

b) The Debtor, as well New JJCI, were formed;

c) The Debtor received certain of Old JJCI's assets, as set forth below, and became solely responsible for certain of its liabilities, including Old JJCI's liabilities arising from talc-related claims against it (other than claims for which the exclusive remedy is provided under a workers' compensation statute or similar laws);

d) New JJCI was allocated all other assets of Old JJCI and became solely responsible for all other liabilities of Old JJCI;

e) A funding agreement (the "Funding Agreement") was established between New JJCI, J&J, and the Debtor for the purpose of ensuring that the Debtor has at least the same, if not greater, ability to pay the Talc Claims against it as Old JJCI had before the 2021 Corporate Restructuring;[4] and

f) The Debtor agreed to indemnify New JJCI and its affiliates for any losses it might suffer related to the Talc Claims.

*Id.* ¶¶ 22–23.

At the time of the 2021 Corporate Restructuring, the Debtor received the

following assets:

a) Old JJCI's rights and interests as payee under the Funding Agreement (as discussed below, J&J and New JJCI have agreed to advance $2 billion under

---

[4]     Without any corresponding repayment obligation, the Funding Agreement obligates New JJCI and J&J, on a joint and several basis, to provide funding, up to the full value of New JJCI, to pay for costs and expenses of the Debtor incurred in the normal course of its business (i) at any time when there is no bankruptcy case and (ii) during the pendency of any chapter 11 case, including the costs of administering the chapter 11 case, in both situations to the extent that any cash distributions received by the Debtor from Royalty A&M are insufficient to pay such costs and expenses.  First Day Decl. ¶ 27.  In addition, the Funding Agreement requires New JJCI and J&J to, up to the full value of New JJCI, fund amounts necessary (i) to satisfy the Debtor's talc-related liabilities at any time when there is no bankruptcy case and (ii) in the event of a chapter 11 filing, to provide the funding for a trust, in both situations to the extent that any cash distributions received by the Debtor from Royalty A&M are insufficient to pay such costs and expenses and further, in the case of the funding of a trust, the Debtor's other assets are insufficient to provide that funding.  *Id.*

the Funding Agreement into a qualified settlement trust);

b) A bank account and approximately $6 million in cash;

c) All contracts of Old JJCI related to its talc-related litigation, including settlement agreements, interests in qualified settlement trusts, indemnity rights, insurance coverage rights, service contracts, and engagement and retention contracts, if any;

d) All equity interests in Royalty A&M, which owns a portfolio of royalty revenue streams, including royalty revenue streams based on third-party sales of certain products, a business that is projected to generate approximately $50 million in revenue per year over the next five years and has the ability to borrow up to $50 million from J&J on terms consistent to those provided to other J&J affiliates;

e) Causes of action that relate to the assets and liabilities allocated to the Debtor;

f) Privileges that relate to the assets and liabilities allocated to the Debtor; and

g) Records that relate to the assets and liabilities allocated to the Debtor.

*Id.* ¶¶ 24, 26, 30.

In total, the Debtor's value is approximately $373.1 million, without taking into account the Funding Agreement with New JJCI and J&J or insurance.  *Id.* ¶ 26.  In addition, J&J and New JJCI have committed to fund a trust that will constitute a "qualified settlement fund" with an aggregate amount of $2 billion for the payment of current and future Talc Claims asserted against or related to the Debtor.  *Id.* ¶ 28.

## **The Debtor's Talc Claims and Decision to File for Chapter 11 Reorganization**

As this Court is aware, cosmetic talc litigation against the Debtor has focused primarily on JOHNSON'S® Baby Powder (hereinafter, "Johnson's Baby Powder") as a purported cause of ovarian cancer and mesothelioma.  *Id.* ¶ 32.  As set forth in the Debtor's Information Brief, No. 21-30589, ECF No. 3, filed on the Petition Date, the Debtor stands behind the safety of Johnson's Baby Powder and maintains, based on decades of internal and third party studies and testing, that it is not a cause of either ovarian cancer or mesothelioma.  On May 19,

2020, Old JJCI announced it would permanently discontinue its line of talc-based Johnson's

Baby Powder in the U.S. and Canada. *Id.* ¶ 28. The decision was based on business

considerations, including lack of sales due to misinformation about the safety of Old JJCI's

talc-based Johnson's Baby Powder. *Id.* ¶ 33.

As of the Petition Date, there were approximately 38,000 ovarian cancer cases

pending against the Debtor, including approximately 35,000 cases pending in the federal

multi-district litigation in New Jersey and approximately 3,300 cases in multiple state-court

jurisdictions across the country. *Id.* ¶ 42. In addition to the ovarian claims, more than

430 mesothelioma cases were pending against the Debtor on the Petition Date. These claims,

like the ovarian cancer claims, spanned the U.S. with cases pending in New Jersey, California,

Illinois, Missouri, New York, and Ohio. Absent its bankruptcy filing, the Debtor expects that

thousands of additional ovarian cancer and mesothelioma cases would have been filed against it

for decades to come. *Id.* ¶ 45.

Old JJCI and J&J asserted that there was no scientific or other support that

Johnson's Baby Powder was either contaminated with asbestos, or was a cause of ovarian cancer

or mesothelioma. Based on these arguments, Old JJCI and J&J had various successes in

cosmetic talc litigation, including dismissing roughly 1,300 ovarian cancer and over

250 mesothelioma cases without payment and achieving 16 key defense verdicts. *Id.* ¶ 38.

Old JJCI also succeeded in obtaining reversal of many plaintiff verdicts on appeal. *Id.* Despite

these results—and the lack of any real proof that its product was unsafe—Old JJCI was also

subject to a number of verdicts involving unpredictable and wildly divergent compensatory and

punitive damages awards. *Id.* In addition, prior to the commencement of this case, Old JJCI had

incurred nearly $1 billion in defending a flood of personal-injury lawsuits relating to alleged talc

exposure, nearly all of which was spent in only the last five years. *Id.* ¶ 40.  In the months prior

to the Petition Date, Old JJCI was paying anywhere from $10 million to $20 million monthly in

defense costs. *Id.*  And cosmetic talc litigation against the Debtor was anticipated to grow for

decades more, as were the extraordinary costs of resolving tens of thousands of expected claims.

*Id.* ¶ 41.

The status quo was untenable given the cost, burden, uncertainty, and anticipated

duration of the cosmetic talc litigation.  The Chapter 11 Case is the only available option to

appropriately assess, resolve, and administer the current and future talc-related claims in an

efficient and equitable manner. *Id.* ¶ 58.

### The Talc Claim Temporary Restraining Order and Preliminary Injunction

On October 21, 2021, the Debtor commenced an adversary proceeding in the

Chapter 11 Case and filed a motion, Adv. Pro. No. 21-03032, ECF No. 2 (the "First PI Motion"),

seeking (i) a declaration that the automatic stay applies to prohibit the commencement or

continuation of the Talc Claims against certain protected parties, including J&J, Old JJCI, New

JJCI, third-party retailers who sold Old JJCI's talc-containing products, and others while its

Chapter 11 Case remains pending; and (ii) a preliminary injunction under section 105(a) of the

Bankruptcy Code to enjoin the commencement or prosecution of actions outside of the

Chapter 11 Case.  Various parties filed objections to the First PI Motion, Adv. Pro.

No. 21-03032, ECF Nos. 50–51, and the Debtor filed a reply, Adv. Pro. No. 21-03032, ECF

No. 58.

The N.C. Bankruptcy Court granted a temporary restraining order prohibiting and

enjoining the prosecution of Talc Claims against the Debtor and Old JJCI and scheduled a

further hearing on the First PI Motion, following discovery.  Adv. Pro. No. 21-03032, ECF

No. 28.  Thereafter, on November 15, 2021, the N.C. Bankruptcy Court entered an order

preliminarily determining that the automatic stay prohibited the commencement or continuation

of the Talc Claims against the non-debtor parties and preliminarily enjoining the same for a

period of 60 days.  Adv. Pro. No. 21-03032, ECF No. 102 (the "Initial PI Order"), ¶ 2.

By an order entered on November 16, 2021, the N.C. Bankruptcy Court

transferred the Chapter 11 Case and the adversary proceeding to the District Court, including the

decision of whether to extend the relief granted by the Initial PI Order, and the Chapter 11 Case

was automatically referred to this Court.  *See* No. 21-30589, ECF No. 416.

Following additional briefing and discovery in connection with the relief

requested in the First PI Motion, the Court held an evidentiary hearing on extending the relief

granted by the Initial PI Order on February 18, 2022.  On February 25, 2022, the Court issued its

Memorandum Opinion, Adv. Pro. No. 21-03032, ECF No. 184 (the "N.J. Mem. Op."), providing

that it would extend the relief granted under the Initial PI Order, including the issuance of a

preliminary injunction with respect to the Talc Claims, for the duration of the Chapter 11 Case,

subject to the Court revisiting continuation of the automatic stay and the preliminary injunction

on June 29, 2022, and every four months thereafter.[5]  N.J. Mem. Op. at 54.

From the outset of the Chapter 11 Case, the Debtor has repeatedly expressed its

desire to engage in mediation with the holders of Talc Claims to facilitate the establishment and

funding of a trust to resolve the Chapter 11 Case and provide equitable recoveries to creditors.

Although any mediation process was delayed pending the Court's ruling on the Motions to

Dismiss filed in the Chapter 11 Case, promptly following the denial of those motions, the Debtor

---

[5]    On March 4, 2022, the Court entered an order (Adv. Pro. 21-03032, ECF 187) granting the requested relief consistent with the Memorandum Opinion.  Also on February 25, 2022, the Court entered an opinion (No. 21-30589, ECF 1572) regarding its denial of motions to dismiss (together, the "Motions to Dismiss") filed by the Official Committee of Talc Claimants, (No. 21-30589, ECF 632) and the law firm of Arnold & Itkin, LLP (No. 21-30589, ECF 766).  The Court entered an order on March 2, 2022 (No. 21-30589, ECF 1603) formally denying the Motions to Dismiss.

renewed its request for mediation, and the Court indicated that it would address that request at the omnibus hearing scheduled for March 8, 2022.

The Debtor is also preparing to engage in mediation with certain governmental authorities. In particular, offices of the attorney general of certain states are conducting investigations or have commenced lawsuits related to the talc products of Old JJCI and J&J. The Debtor has engaged with certain of these governmental parties and has commenced discussions regarding the formation of an ad hoc committee representing more than 40 state attorneys general to enter into mediation with the Debtor with a view to resolving their claims.

### The Securities Claims Asserted by the Securities Claimants

On February 8, 2018, the initial complaint in the Securities Action was filed, alleging two counts of securities law violations against J&J and two of its executives, Alex Gorsky, then Chairman and Chief Executive Officer of J&J; and Dominic J. Caruso, then Chief Financial Officer and Executive Vice President of J&J. *See* Compl., App. A (Initial Complaint from the Securities Action) ¶¶ 14–21, 76–91. The first count alleged violations of section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and the SEC's regulation implementing the provision, Rule 10b-5, 17 C.F.R. § 240.10b-5, against J&J, Gorsky, and Caruso. *Id.* ¶¶ 76–85. The second count alleged violations of section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), against Gorsky and Caruso. *Id.* ¶¶ 86–91.[6] After being appointed as lead plaintiff, San Diego Employees

---

[6]     The "basic elements" of a section 10(b) and Rule 10b-5 claim include (1) "a material misrepresentation or omission"; (2) "scienter"; (3) "a connection with the purchase or sale of a security"; (4) "reliance"; (5) "economic loss"; and (6) "loss causation." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005); *see also Gold v. Ford Motor Co.*, 577 F. App'x 120, 122 (3d Cir. 2014) (citing *id.*). A person is liable under section 20(a) of the Exchange Act if she, "directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable." 15 U.S.C. § 78t(a). But "liability under Section 20(a) is derivative of an underlying violation of Section 10(b) by the controlled persons." *Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 252 (3d Cir. 2009).

Retirement Association filed an amended complaint, asserting both claims against five new

defendants and including further allegations. *See generally* Compl., App. B. The five additional

defendants included the following individuals: J&J officer Michael Sneed; former J&J officer

Sandra Peterson; and former Old JJCI employees Carol Goodrich, Joan Casalvieri, Ph.D. and

Tara Glasgow. *See id.* ¶¶ 23–27. On December 27, 2019, the District Court dismissed the

claims against Caruso, Peterson, and Sneed and limited the section 10(b) and Rule 10b-5 claims

"to those stemming from . . . statements regarding the safety of its Talc Products, the 'asbestos-

free' nature of its talc, and the Company's commitment to product safety, quality assurance, and

research." *Hall v. Johnson & Johnson*, No. 3:18-cv-01833, 2019 WL 7207491, at *1 (D.N.J.

Dec. 27, 2019).

        The Securities Action has been in discovery since the District Court disposed of

the motion to dismiss. Fact discovery was scheduled to close on March 4, 2022, with the court

permitting certain fact witness depositions to occur after that date. Ex. 4 (Text Minute Entry

(Dec. 9, 2021), No. 3:18-cv-01833) (extending discovery to March 4, 2022); Ex. 5 (Letter Order

at 1–2 (Feb. 4, 2022), No. 3:18-cv-1833, ECF No. 154) (permitting three fact witness depositions

to occur after March 4). On March 2, 2022, the Court suspended all deadlines until it rules on

pending motions, including the Securities Claimant's motion for class certification and certain

discovery disputes. Ex. 10 (Text Minute Entry (Mar. 2, 2022), No. 3:18-cv-1833, ECF No. 156.

        To date, the Securities Claimants have propounded 124 requests for production on

the Third-Party Securities Defendants, including many that target information at the heart of the

Talc Claims. *See* Exs. 6–9 (compiled requests for production). Examples of documents and

materials produced include transcripts, exhibits, and videos from depositions that have occurred

in the talc product-liability litigation. In July 2021, the parties in the Securities Action stipulated

that the Securities Claimants may take up to 30 depositions of current and/or former J&J

employees and up to 70 hours of merits depositions of third parties and that the Third-Party

Securities Defendants may take up to 15 merits depositions.  Ex. 11 (Stipulation Regarding

Merits Depositions and the Close of Fact Discovery, ECF No. 121)).  Expert discovery will

extend well beyond fact discovery.

   As is clear from the District Court's order on the motion to dismiss and from the

Securities Claimants' discovery requests, there is substantial overlap between the Securities

Claims and the Talc Claims.  The Third-Party Securities Defendants maintain (as does the

Debtor) that the talc products were safe and free from asbestos (and that the statements to that

effect were true and made in good faith).  To establish that the statements at issue were false or

misleading in violation of the securities laws, the Securities Claimants will need to prove that the

talc products were harmful or contained asbestos.  That issue will hinge on the same documents,

testimony, and other discoverable information the talc claimants would use in any claims

estimation in the Chapter 11 Case or to otherwise prove product liability against the Debtor.

## ARGUMENT

   Pursuant to section 105(a) of the Bankruptcy Code, the Court should enter a

preliminary injunction enjoining the Securities Claimants from prosecuting the Securities Action

to avoid an immediate and ongoing adverse impact on the Debtor's ability to successfully

negotiate, formulate and confirm a chapter 11 plan.

## I.  THE COURT HAS SUBJECT MATTER JURISDICTION.

   Bankruptcy courts possess subject matter jurisdiction over "all civil proceedings

arising under title 11, or arising in or related to cases under title 11."  28 U.S.C. § 1334(b).

The Court has jurisdiction over this proceeding because it (i) arises under, (ii) arises in and (iii) is

related to the Chapter 11 Case.  Proceedings arising under and arising in a chapter 11 case are

considered "core" proceedings, whereas proceedings related to a chapter 11 case are considered
"non-core." *In re E. Orange Gen. Hosp., Inc.*, 587 B.R. 53, 71 (D.N.J. 2018) (citing *In re
Resorts Int'l, Inc.*, 372 F.3d 154, 162 (3d Cir. 2004)).

A.    **The Court Has Both "Arising Under" and "Arising In" Jurisdiction to Grant
Relief that Ensures the Effectiveness of the Automatic Stay and That Would
Have No Existence Outside of Bankruptcy**

The Debtor's request to enjoin the Securities Action under section 105(a) "arises

under" the Bankruptcy Code.  "A case 'arises under' title 11 'if it invokes a substantive right

created by title 11." *Stoe v. Flaherty*, 436 F.3d 209, 216 (3d Cir. 2006) (quoting *Torkelsen v.

Maggio* (*In re Guild & Gallery Plus, Inc.*), 72 F.3d 1171, 1178 (3d Cir. 1996)).  Section 105(a)

does not independently confer subject matter jurisdiction.  *See In re W.R. Grace & Co.*, 591 F.3d

164, 170–71 (3d Cir. 2009) (quoting *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 225 (3d Cir.

2004)) (holding that, because section 105(a) does not provide an independent source of federal

subject matter jurisdiction, a court must establish that it has subject matter jurisdiction prior to

issuing an injunction under section 105(a)).  Nevertheless, for the reasons described below, the

Debtor's request to temporarily stay the Securities Action for the duration of the Chapter 11 Case

is necessary to preserve and effectuate the automatic stay, which is "a substantive right provided

by the Bankruptcy Code." *Roggio v. Roggio* (*In re Roggio*), 612 B.R. 655, 660 (Bankr. M.D. Pa.

2020).  Thus, the Court has "arising under" jurisdiction to consider the Debtor's request for a

section 105(a) injunction to temporarily stay the Securities Action because "common sense

indicates that, if the Court has subject matter jurisdiction over a proceeding to determine the

applicability of the automatic stay, then it has jurisdiction over a related motion for preliminary

injunctive relief." *In re FPSDA I, LLC*, No. 10-75439, 2012 WL 6681794, at *5 (Bankr.

E.D.N.Y. Dec. 21, 2012).  Here, absent a stay of the Securities Action, the Court's recent holding

that section 362 of the Bankruptcy Code applies to stay the Talc Claims asserted against the

certain nondebtor parties would be undermined if the facts concerning the safety of talc were

adjudicated in the Securities Action after adjudication of the same facts has been stayed in all

other actions.

       The Court independently has "arising in" jurisdiction to consider the Debtor's

request for injunctive relief.  A proceeding "arises in" a bankruptcy case when it would "have no

existence outside of the bankruptcy."  *In re G-I Holdings, Inc.* (*G-I Holdings I*), 580 B.R. 388,

415 (Bankr. D.N.J. 2018) (quoting *Stoe*, 436 F.3d at 261).  A request for a section 105(a)

injunction, tied to and lasting only during the pendency of a debtor's bankruptcy case, arises only

in bankruptcy cases.  *See In re Monroe Well Serv., Inc.*, 67 B.R. 746, 753 n.9 (Bankr. E.D. Pa.

1986) (explaining that "a proceeding in which a section 105 injunction is sought" is "a

proceeding 'arising in' title 11"); *Brier Creek*, 486 B.R. at 685 (holding that "arising in"

jurisdiction existed because "a § 105 injunction arises only in bankruptcy cases in that such an

injunction would have no existence outside of bankruptcy").

    **B.**    **The Court Also Has "Related to" Jurisdiction Over the Securities Action**

       At a minimum, though, the Court has "related to" jurisdiction with respect to the

relief requested herein.  "Related to" jurisdiction exists over proceedings involving non-debtors

when "the outcome of that proceeding could conceivably have any effect on the estate being

administered in bankruptcy."  *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984); *see also*

*In re Bestwall*, 606 B.R. 243, 249 (Bankr. W.D.N.C. 2019) (discussing *Pacor* and explaining that

"courts have made clear that [the *Pacor*] standard applies whether any claims against a third

party are alleged to be 'direct' or 'derivative'" in the mass tort context).  More specifically, an

action against a non-debtor "is related to bankruptcy if the outcome could alter the debtor's

rights, liabilities, options, or freedom of action (either positively or negatively) and which in any

way impacts upon the handling and administration of the bankruptcy estate."  *Id.*

Here, the Securities Action would at least conceivably have an effect on the

Debtor's estate and reorganization.  As discussed in more detail below, the Talc Claims and

Securities Claims are intimately intertwined in a such a way that permitting the Securities Action

to proceed will jeopardize legal interests of the Debtor that are intended to be resolved in the

Chapter 11 Case.  Indeed, the Securities Action threatens to create an evidentiary record and to

potentially determine issues that could materially affect the value of the Talc Claims pending

against the Debtor and impact negotiations regarding a consensual plan of reorganization.  Thus,

the continuation of the Securities Action while the Debtor's bankruptcy is ongoing, jeopardizes

the Debtor's legal interests and rights in a way that impacts the administration and handling of its

bankruptcy estate.  "Related to" jurisdiction exists here.  *See* N.J. Mem. Op. at 14-15 (finding

that the Court possessed "related to" jurisdiction with respect to actions seeking to prosecute

Talc Claims against nondebtor entities because "litigation of talc claims against the Protected

Parties has a 'conceivable effect' on the bankruptcy estate").

## II.     THE COURT SHOULD EXERCISE ITS AUTHORITY UNDER SECTION 105(a) TO ENJOIN THE SECURITIES CLAIMANTS' CONTINUED PROSECUTION OF THE SECURITIES CLAIMS.

Section 105(a) of the Bankruptcy Code provides that the Court "may issue any

order, process, or judgment that is necessary or appropriate to carry out the provisions of [the

Bankruptcy Code]."  11 U.S.C. § 105(a).  That provision "'empowers the bankruptcy court to

enjoin parties other than the bankrupt' from commencing or continuing litigation."  *Robins*, 788

F.2d at 1002 (quoting *Otero Mills*, 25 B.R. at 1020).  This includes "ample power to enjoin

actions excepted from the automatic stay which might interfere in the rehabilitative process" of a

bankruptcy case.  *Johns-Manville I*, 26 B.R. at 425 (quoting 2 *Collier on Bankruptcy* § 362.05

(15th ed. 1982)).

Assessing whether issuance of a section 105 injunction is proper requires a broad inquiry into "whether the litigation 'could interfere with the reorganization of the debtor' or 'would interfere with, deplete[,] or adversely affect property of [the] estates or which would frustrate the statutory scheme of chapter 11 or diminish [the debtor's] ability to formulate a plan of reorganization.'" *In re W.R. Grace Co.*, 115 F. App'x at 570 (quoting *In re A.H. Robins Co.*, 828 F.2d at 1025); *Robins*, 788 F.2d at 1003 (quoting *Johns-Manville I*, 26 B.R. at 425) (explaining that a court may use its section 105(a) authority to enjoin parties from prosecuting actions that "might interfere in the rehabilitative process whether in a liquidation or in a reorganization case"); *W.R. Grace & Co. v. Chakarian (In re W.R. Grace & Co.)*, 386 B.R. 17, 30 (Bankr. D. Del. 2008) (explaining that enjoining third-party litigation is appropriate where, among other things, "the third-party action will have an adverse impact on the debtor's ability to accomplish reorganization").

Acting under the broad authority granted by section 105(a), courts have consistently stayed claims against non-debtor entities, including a debtor's affiliates, both in mass tort and non-mass tort bankruptcies, to maintain the integrity of the debtor's estate.[7] Under section 105, "the Court may issue or extend stays to enjoin a variety of proceedings [including discovery against the debtor or its officers and employees] which will have an adverse impact on the Debtor's ability to formulate a Chapter 11 plan." *Robins*, 788 F.2d at 1003 (alteration in

---

[7] As to non-asbestos mass tort bankruptcies, *see In re Purdue Pharma L.P.*, No. 19-23649, Adv. No. 19-08289 [Adv. Pro. Dkt. 82] (Bankr. S.D.N.Y. Oct. 11, 2019) *aff'd* 619 B.R. 38 (S.D.N.Y. 2020); *In re USA Gymnastics*, No. 18-09108, Adv. No. 19-50075 [Adv. Pro. Dkt. 71] (Bankr. S.D. Ind. Apr. 22, 2019); *In re TK Holdings Inc.*, Case No. 17-50880, Adv. No. 17-50880 [Adv. Pro. Dkt. 63] (Bankr. D. Del. Aug. 22, 2017); *In re Lyondell Chem. Co.*, 402 B.R. 571 (Bankr. S.D.N.Y. 2009); *Robins*, 788 F.2d at 999-1000.  As to non-mass tort bankruptcies, *see In re Am. Film Techs., Inc.*, 175 B.R. 847, 855 (Bankr. D. Del. 1994) (staying claims against a debtor's directors); *In re Family Health Servs., Inc.*, 105 B.R. 937, 942–43 (Bankr. C.D. Cal. 1989) (staying claims by certain health care providers against members and enrollees of a debtor HMO); *In re Heron, Burchette, Ruckert & Rothwell*, 148 B.R. 660, 690 (Bankr. D.D.C. 1992) (finding that injunction of suits against non-debtor partners should issue); *In re Myerson & Kuhn*, 121 B.R. 145, 160 (Bankr. S.D.N.Y. 1990) (enjoining suits against non-debtor partners).

original) (quoting *In re Johns-Manville Corp.* (*Johns-Manville II*), 40 B.R. 219, 226 (S.D.N.Y.

1984)).

The authority to stay proceedings involving non-debtors extends to actions that

are independent of claims against the Debtor—in addition to matters derivative of the bankruptcy

(i.e., claims derivative of the estate)—so long as such proceedings could have an adverse impact

on the Debtor's reorganization.  *See Dunaway v. Purdue Pharm. L.P. (In re Purdue Pharm.*

*L.P.)*, 619 B.R. 38 (S.D.N.Y. 2020) (affirming bankruptcy court's issuance of preliminary

injunction to halt pending state and private actions against debtors and certain non-debtors,

including former or current owners, directors, officers and other associated entities and including

claims that were allegedly independent or not derivative of the debtors); Order Pursuant to

11 U.S.C. § 105 Granting in Part and Denying in Part Debtor's Mot. for a Prelim. Inj., *TK*

*Holdings Inc. v. State of Hawai'i (In re TK Holdings Inc.)*, No. 17-11375, Adv. Pro. No. 17-

50880 (Bankr. D. Del. Aug. 22, 2017) [ECF 63] (enjoining state and private actions against

non-debtors for 90 days, subject to further extensions, notwithstanding arguments that claims

against non-debtors were direct claims).

When considering whether to grant preliminary injunctive relief under

section 105(a), courts in the Third Circuit generally apply the traditional four-factor test for a

preliminary injunction, tailored to the bankruptcy context.  *See In re Union Trust Phila., LLC*

(*Union Trust II*), 460 B.R. 644, 660 (E.D. Pa. 2011); *Union Trust I*, 465 B.R. at 771 & n.4.

The four factors are:  (1) the debtor's reasonable likelihood of a successful reorganization;

(2) the imminent risk of irreparable harm to the debtor's estate in the absence of an injunction;

(3) the balance of harms between debtor and the nonmoving party; and (4) whether the public

interest weighs in favor of an injunction.  *Union Trust II*, 460 B.R. at 660; *see also Aldrich*

*Pump*, 2021 WL 3729335, at *33; *DBMP*, 2021 WL 3552350, at *38.  Movants must satisfy all

four factors to obtain relief.  *Union Trust II*, 460 B.R. at 660; *see also P.C. Yonkers, Inc. v.*

*Celebrations the Party & Seasonal Superstore, LLC*, 428 F.3d 504, 508 (3d Cir. 2005)

(explaining that each preliminary injunction factor must be satisfied).  Here, the preliminary

injunction factors all support enjoining the Securities Action.

     **1.**      **The Debtor Has a Realistic Possibility of a Successful Reorganization.**

     "In the bankruptcy context, reasonable likelihood of success is equivalent to the

debtor's ability to successfully reorganize."  N.J. Mem. Op. at 47 (quoting *Union Trust II*, 460

B.R. at 660); *see also In re G-I Holdings Inc.*, 420 B.R. 216, 281 (Bankr. D.N.J. 2009)

(evaluating the "reasonable likelihood of a successful plan of reorganization").  "To demonstrate

a reasonable likelihood of success, a movant need only show the prospect or possibility that he or

she will succeed, and need not prove same with certainty."  N.J. Mem. Op. at 47 (citing

*Conestoga Wood Specialties Corp. v. Sec'y of U.S. Dep't of Health & Human Servs.*, 724

F.3d 377 (3d Cir. 2013) (Jordan, J., dissenting) *rev'd and remanded sub nom. Burwell v. Hobby*

*Lobby Stores, Inc.*, 573 U.S. 682, 134 S. Ct. 2751, 189 L. Ed. 2d 675 (2014) (collecting cases)).

Courts have "consistently recognize[d] that satisfying this factor does not set a high bar."

*DBMP*, 2021 WL 3552350, at *39; *see also In re Bestwall*, 606 B.R. 243, 254 (Bankr. W.D.N.C.

2019).  This Court has already determined that the Debtor has a realistic possibility of

successfully reorganizing.  *See* N.J. Memo. Op. 47.  And there is no reason for the Court to

revisit that determination at this point.  The Debtor entered bankruptcy to permanently, fully, and

equitably resolve current and future talc-related claims against it through the establishment of a

trust.  The Debtor has ample funding to do so.  The Debtor's aggregate value (excluding

insurance assets and the value of the Funding Agreement) is approximately $373.1 million.  First

Day Decl. ¶ 26.  And to the extent its assets (including insurance) are insufficient, it has access to

additional funds through the Funding Agreement with J&J and New JJCI.  *Id.*  These assets

should be sufficient to support the reorganization and the creation of a trust to resolve the

Debtor's talc-related liabilities.

   The Debtor has entered bankruptcy in good faith and has favorable prospects for

resolving the Talc Claims through a reorganization that conforms with the Bankruptcy Code.

Similarly situated companies facing extensive liability from mass torts have successfully used

bankruptcy to resolve those claims, and bankruptcy has been recognized as the most logical

forum for doing so.  *See In re Fed-Mogul Glob., Inc.*, 684 F.3d 355, 359 (3d Cir. 2012)

("Bankruptcy has proven an attractive alternative to the tort system for corporations [facing mass

tort claims] because it permits a global resolution and discharge of current and future liability,

while claimants' interests are protected by the bankruptcy court's power to use future earnings to

compensate similarly situated tort claimants equitably."); S. Elizabeth Gibson, *Judicial*

*Management of Mass Tort Bankruptcy Cases*, Federal Judicial Center 1 (2005),

https://www.fjc.gov/sites/default/files/2012/GibsJudi.pdf (noting that "bankruptcy courts have

become a forum for companies seeking the resolution of pending and threatened mass tort

litigation" and that, as of the publication date, "over seventy companies, motivated primarily by

their desire to reach a final resolution of their mass tort liabilities, have sought bankruptcy

protection").  The Debtor is committed to do the same.  To this end, the Debtor plans

immediately to engage in good faith negotiations to reach a consensual resolution of the Chapter

11 Case with representatives for current and future talc claimants.  First Day Decl. ¶ 60.

   For these reasons, and as this Court has recently recognized, *see* N.J. Memo.

Op. 47, the Debtor is likely to successfully reorganize.

## 2.    The Debtor Will Be Irreparably Harmed Unless the Injunction Issues

The continued prosecution of the Securities Claims against the Third-Party

Securities Defendants will irreparably harm the Debtor.  In analyzing irreparable harm, the key

question is "whether the litigation 'could interfere with the reorganization of the debtor' or

'would interfere with, deplete or adversely affect property of [the] estates or which would

frustrate the statutory scheme of chapter 11 or diminish [the debtor's] ability to formulate a plan

of reorganization.'"  *Grace*, 115 F. App'x at 570 (first quoting *In re A.H. Robins Co.*, 828 F.2d at

1025, then quoting *In re Johns-Manville*, 26 B.R. 420, 436 (Bankr. S.D.N.Y. 1983)); *Aldrich

Pump*, 2021 WL 3729335, at *33 ("[T]he critical, if not decisive, issue over whether injunctive

relief should be granted is whether and to what extent the non-debtor litigation interferes with the

debtors' reorganization efforts." (quoting *Brier Creek*, 486 B.R. at 694)).  Continued prosecution

of the Securities Claims will gravely harm the Debtor's reorganization efforts.

The Securities Claims are "inherently intertwined" with the Talc Claims at the

heart of the restructuring and threaten to interfere with this proceeding, denying the Debtor the

protections of chapter 11 and the opportunity to complete its reorganization.  W.D.N.C. Prelim.

Inj. Order at 4.  Although the elements of the Securities Claims differ in part from those of the

Talc Claims, the factual overlap between the two sets of claims is substantial, and the essence of

both is the allegation that the talc used by Old JJCI is harmful.  Simply put, the Securities

Claimants cannot prove their claims without proving their disputed allegations that Old JJCI's

and J&J's talc products were contaminated with asbestos or were otherwise harmful.  Both sets

of claims involve the same products, the same entities, the same witnesses, the same alleged

conduct, and the same general time periods.  The Securities Claims are thus, at their core,

factually derivative of the Talc Claims, and they have substantial potential to generate an

evidentiary record that impacts the Talc Claims and disrupts the Debtor's reorganization.

As a result, this case is (i) comparable to *Grace*, where the debtor's alleged conduct predominated the claims against the non-debtors and the court found it appropriate to enjoin such claims based on an identity of interest, and (ii) in line with other cases where courts have likewise found that even allegedly direct claims against non-debtors do not cut off an identity of interests between the debtor and the non-debtors. *Grace*, 386 B.R. at 30-36 (rejecting the argument that the test for identity of interest could not be satisfied where the non-debtor was allegedly independently liable and preliminary enjoining actions against a non-debtor railroad company because the debtors' operations and conduct were at the "core of the issues" raised in the actions against the non-debtor); *Mallinckrodt PLC v. Conn. (In re Mallinckrodt PLC)*, No. 20-408, 2021 WL 523625, at *3, *6 (D. Del. Feb. 11, 2021) (explaining that the non-debtors could have independent liability that would not preclude or estop the bankruptcy court's conclusions that the claims were "inextricably intertwined" for purposes of a preliminary injunction); *Purdue*, 619 B.R. at 45, 53 (recognizing an identity of factual interest in allegations against the non-debtor and the debtors and fact that objectors would rely on the same facts to prove the claims against the non-debtor as against the debtor); Tr. of Oct. 11, 2019 Hr'g, *Purdue Pharm. L.P. v. Mass. (In re Purdue Pharm. L.P.)*, Adv. Pro. No. 19-08289 [Dkt. 87] (Bankr. S.D.N.Y. Oct. 11, 2019) at 262:4-6 (stating that even if "a claim against a third party is independent or not derivative of the Debtors, it still may be enjoined under proper circumstances"); *see also W.R. Grace & Co. v. Chakarian (In re W.R. Grace & Co.)*, No. 01-01139, 2004 WL 954772, at *2–3 (D. Del. Apr. 29, 2004) (finding that there was an identity of interest between the debtor and the non-debtor owner of property that was previously owned by the debtor in litigation between two non-debtors given entitlement to contractual indemnity).

Indeed, in the Securities Claimants' own words, "the underlying issues surrounding the Texas Two-Step bankruptcy are highly relevant to the claims and defenses at issue" in the Securities Action.  Ex. 1 (Third-Party Securities Defendants' Counsel's Feb. 23, 2022 Letter to John M. Skakun III) at 3.  And the Securities Claimants maintain that "the bankruptcy concerns a critical development that is part of the complete story of the alleged omissions and false statements at issue in this case" because "the bankruptcy arose out of the same transaction as the fraudulent scheme alleged in [the securities] action." *Id.*  The actions of the claimants in the Chapter 11 Case similarly demonstrate the overlap between this case and the Securities Action as the public statements at issue in the Securities Action have been the subject of examinations and arguments in various hearings throughout this proceeding.  *E.g.*, Hr'g Tr. at 98:8-102:6 (Oct. 22, 2021) (TRO Hearing) (asking questions about Gorsky's public statements concerning the safety of talc-containing products); Hr'g Tr. at 229:3-230:1 (Nov. 4, 2021) (PI Motion Hearing Day 1) (same); Hr'g Tr. at 431:2-433:14 (Nov. 5, 2021) (PI Motion Hearing Day 2) (questioning concerning public statements about the safety of talc); Hr'g Tr. at 176:10-177-8 (Feb. 18, 2022) (Motion to Dismiss Hearing) (emphasizing Gorsky's public statements concerning the safety of talc).

Continued prosecution of the Securities Claims could generate an evidentiary record concerning the alleged risks of talc that would materially affect the Talc Claims pending against the Debtor.  As the North Carolina court recognized, "[s]tatements, testimony[,] and other evidence generated in litigation of Debtor Talc Claims" against other parties "could be used to try to establish the Debtor's own liability for the exact same talc-related claims." W.D.N.C. Prelim. Inj. Order at 5-6.  And as this Court concluded:

> Because the talc-related claims against the Debtor and the Protected Parties
> implicate the same product, the same time period, the same alleged defect and the

same alleged harm, it is possible that the evidentiary record developed in continued litigation against the Protected Parties could prejudice Debtor—especially considering that Debtor would be absent from the continued litigation.

N.J. Mem. Op. at 41.

Courts in other proceedings have likewise recognized that this sort of potential prejudice supplies grounds for an injunction. *DBMP*, 2021 WL 3552350, at *41 (litigating the same claims outside of the bankruptcy "would undermine the purposes of chapter 11 and section 524(g) to resolve all such current and future claims in a fair and equitable manner through a chapter 11 plan"); *Bestwall*, 606 B.R. at 256; *Johns-Manville II*, 40 B.R. at 224–25; *In re W.R. Grace*, 386 B.R. at 34–35. As one court put it, "once a witness has testified to a fact, or what sounds like a fact, that witness may be confronted with his prior testimony under oath in a future proceeding" involving the debtor regardless of whether the debtor "was a party to the record on which the initial testimony was taken." *Johns-Manville II*, 40 B.R. at 225. The same concern arises for other evidence: "Once an admission against interest is made, under oath or otherwise, by the agent of a party, that admission stands for all time." *Id.* Regardless of what the parties to the other proceeding might "stipulate, the thousands of other claimants and cross-claimants who are after [the debtor's] assets, would be entitled to use the product of such discovery." *Id.*

The Third Circuit has likewise highlighted this concern. In *In re W.R. Grace & Co.*, the Third Circuit concluded that a section 105 injunction properly issued when considering an appeal from a district court's order vacating a bankruptcy court's order that refused to modify an injunction staying state-court litigation. 115 F. App'x at 566. In vacating the district court's order, the Third Circuit explained that the bankruptcy court "properly noted the practical difficulty and inevitable implication on the debtor of findings that might be made in [the state-court litigation]." *Id.* at 569. The court approved of the bankruptcy court's view that at the core

-29-

of the state-court litigation was the "conduct" attributable to the debtor and, as a result, the state-court litigation was "implicating something on behalf of the debtor." *Id.* at 569.  The Third Circuit thus concluded that the bankruptcy court's application of the stay to the state-court litigation was proper.  *See id.* at 570.

Confirming the overlap here, discovery in the Securities Action has substantially overlapped with discovery related to the Talc Claims.  That overlap includes document requests and testimony concerning talc-related liability.  *See* Exs. 6–9.  For example, one discovery request in the Securities Action sought "[a]ll documents, communications and Written Discovery that you previously produced, whether as a party or non-party, in connection with any tort action related to the safety of Johnson's Baby Powder, Shower-to-Shower or the talc used in Johnson & Johnson products."  Ex. 6 (Defs.' Objs. & Resps. To Pl.'s 1st RFPs) at 7 (Request No. 5).  Another request for production sought "[a]ll deposition transcripts, interview notes or other statements produced in connection with any testimony you gave, whether as a party or non-party in connection with any tort action related to the safety of Johnson's Baby Powder, Shower-to-Shower or the talc used in Johnson & Johnson products, as well as any exhibits or other documents referenced therein."  *Id.* at 8 (Request No. 7).  Paging through Exhibits 6 through 9 shows the degree to which discovery on the Securities Claims has focused on the same evidence as the Talc Claims.

In fact, the most recent requests for production took direct aim at the corporate restructuring that led to the Debtor's Chapter 11 Case.  *See* Ex. 9 (Defs.' Objs. & Resps. to Pl.'s 4th Set of RFPs).  There, the Securities Claimants requested "all documents concerning J&J's decision to execute the Texas Two Step, including but not limited to:  (a) all draft statements concerning the decision; (b) all documents concerning the reason or reasons for the decisions;

(c) documents sufficient to identify who was involved in the decision; and (d) documents

sufficient to identify when the decision was made" and "[a]ll Documents considered by J&J in

coming to the decision to execute the Texas Two Step." *Id.*

Even after fact discovery is completed in the Securities Action (although further

fact depositions are upcoming), expert discovery there will continue to highlight these concerns.

Expert discovery in the Securities Action will directly overlap with issues at the heart of the Talc

Claims, including alleged asbestos product contamination, testing, and safety issues (all relating

to general causation) and regulatory interactions.  Irreparable harm to the Debtor and its

reorganization efforts is evident.

The District Court's treatment of the Securities Claims further demonstrates their

entanglement with the Talc Claims.  In evaluating the Third-Party Securities Defendants' motion

to dismiss, the District Court held that the Securities Claimants had adequately alleged that the

Third-Party Securities Defendants' "statements regarding the safety of its Talc Products, the

'asbestos-free' nature of its talc, and the Company's commitment to product safety, quality

assurance, and research" were actionable.  *Hall*, 2019 WL 7207491, at *30.  The evidence

relevant to those statements is the same evidence relevant to the Talc Claims.  The District Court

emphasized, moreover, that any resolution of the Securities Claims "must be based upon a full

record," which, as noted above, the Securities Claimants are developing through discovery of—

and eventually a trial based on—the same evidence that is relevant to the Talc Claims.  *Id.*

In addition, because the Debtor's Chapter 11 Case has been transferred to this

Court, the Talc Claims and the Securities Claims are now pending in the same judicial district.

There are thus parallel proceedings in the same district involving the same factual matters and

intertwined claims.  Any factual finding on liability from the Securities Action could affect any

estimation proceeding concerning the Talc Claims before this Court and, in turn, the value of the

Debtor's estate.  This intra-district overlap underscores the practical importance of staying the

Securities Claims—absent a stay, the Debtor will be attempting to reorganize and efficiently

settle the Talc Claims through bankruptcy in one courtroom, as factual findings that could

influence fundamental aspects of the Chapter 11 Case are being issued in another.  Any such

parallel process undoubtedly would "have an adverse impact on the bankruptcy estate, . . . hinder

reorganization efforts, and . . . serve as a constant drain on resources and time."  N.J. Mem. Op.

at 48.

Here, the disputed allegation that Old JJCI's or J&J's talc products are

contaminated with asbestos or otherwise harmful is both at the heart of every Talc Claim and a

critical element of the Securities Claims.  The Securities Claimants assert that the Third-Party

Securities Defendants made false or misleading statements with respect to the safety of such

products.  Absent a stay, therefore, that issue necessarily must be adjudicated in any litigation of

the Securities Action.

Failing to enjoin the Securities Claimants from prosecuting the Securities Claims

would thus irreparably harm the Debtor, and this factor supports issuing a preliminary injunction.

### 3.      The Balance of Harms Weighs Heavily in Favor of Issuance of the Preliminary Injunction

The Debtor faces significant harm should the Securities Action proceed.  Indeed,

continuation of the Securities Action while the Chapter 11 Case remains pending would

undermine the very purpose of this reorganization.  *See* N.J. Mem. Op. at 48-50 (balancing the

harms and explaining the talc claimants will "benefit from . . . the handling of their claims

through the bankruptcy process"); W.D.N.C. Prelim. Inj. Order at 6 (finding that "the purpose of

the Debtor's Chapter 11 Case would be defeated if the litigation" in issue were allowed to

proceed).  Allowing the Securities Claims to proceed risks resolving the key factual issues

underlying both the Securities Claims and the Talc Claims in two different courts in the same

judicial district—impeding negotiations with the Debtor's stakeholders and the establishment of

a bankruptcy trust, and undermining the goals of the Chapter 11 Case.  *See* N.J. Mem. Op.

at 48-50 (explaining that grant of the injunction protects the interests of current and future

claimants because the bankruptcy process "prevents a race for proceeds[] and promotes equality

in distribution).

    While a preliminary injunction would spare the Debtor significant harm, it would

only temporarily delay resolution of a complex securities case that is already over four years old.

The Securities Claimants' damages are not continuing to accrue.  Further, "it is well established

that a delay is not sufficient to prevent the issuance of an injunction."  *Bestwall*, 606 B.R. at 257;

*see also DBMP* 2021 WL 3552350, at *42 (concluding that "potential delays occasioned by the

stay and injunction [were] outweighed" by continued litigation and derailing the debtor's

reorganization effort); *Union Trust I*, 465 B.R. at 773–74 (same); *In re Saxby's Coffee*

*Worldwide, LLC*, 440 B.R. 369, 382 (Bankr. E.D. Pa. 2009) (granting injunction because

defendants had not "identified any particularized harm they are likely to suffer if delayed for a

short period of time from enforcing their remedies against [the non-debtors]"); *see also*

W.D.N.C. Prelim. Inj. Order at 6 ("Delay, in and of itself, is insufficient to overcome irreparable

harm caused to the Debtor and its estate.").  So too here.  And, if the Court determines to review

any injunction of the Securities Action every four months, any potential harm to the Securities

Claimants can likewise be reevaluated during each such review.

### 4.    The Public Interest Supports Issuing the Injunction

    Granting a section 105 injunction will maximize the potential for the Debtor's

successful reorganization and is thus entirely in the public interest.  *Integrated Health*, 281 B.R.

at 239 ("In the context of a bankruptcy case, promoting a successful reorganization is one of the most important public interests."); *see also Saxby's Coffee*, 440 B.R. at 383 ("To the extent that the injunction is necessary to and will foster the Debtor's reorganization it serves 'one of the most important public interests.'" (quoting *Integrated Health*, 281 B.R. at 239)); *In re Gander Partners LLC*, 432 B.R. 781, 789 (Bankr. N.D. Ill. 2010); *Sudbury*, 140 B.R. at 465; *see also* N.J. Mem. Op. at 50 ("[T]his Court holds no doubts that claim resolution through the bankruptcy process is in the public interest."); W.D.N.C. Prelim. Inj. Order at 6 ("The public interest lies with the Debtor completing its reorganization process and resolving the Debtor Talc Claims in a uniform and equitable manner.").  The public has an especially strong interest in successful reorganizations in the mass tort context.  *W.R. Grace & Co.*, 386 B.R. at 36.  Indeed, "[i]n this case, due to the volume of claims, jurisdictional spread, and numerous controversies, completing the reorganization process also serves the public interest by resolving thousands of claims in a uniform and equitable manner."  *Id.*; *see also DBMP*, 2021 WL 3552350, at *42 ("DBMP's successful reorganization also would promote Congress's particular goal in section 524(g) by establishing an asbestos trust that would efficiently and equitably resolve tens of thousands of asbestos claims.").

Further, permitting the Securities Action to continue against the Third-Party Securities Defendants would jeopardize the very purpose of the Chapter 11 Case and thereby undermine the public interest.  Promoting a successful reorganization is the best way to equitably resolve the Debtor's liabilities.  The paramount interest in a restructuring proceeding is that the restructuring be successful.  The continued separate litigation of issues that are involved in the bankruptcy case "would undoubtedly interfere with" a debtor's reorganization.  *DBMP*, 2021

WL 3552350, at *43; *Aldrich Pump*, 2021 WL 3729335, at *38.  The public interest strongly

favors keeping the Debtor's attention focused on reorganizing and creating a bankruptcy trust.

There will be ample time to litigate the Securities Claims later.  Issuing a

preliminary injunction would not permit the Third-Party Securities Defendants to escape their

alleged securities liability, should they be found to have any.  *See, e.g.*, *DBMP*, 2021 WL

3552350, at *42 (preliminary injunction was "necessary to protect the Debtor during its efforts to

reorganization, but it will not 'allow any party to escape any asbestos related liabilities'"

(citation omitted)).  Rather, an injunction would merely give the Debtor a "breathing spell" to

successfully restructure.  That is decidedly in the public interest.

*        *        *

Each of the four factors favors a preliminary injunction, and the Court should

exercise its authority under section 105(a) to temporarily pause the Securities Claims while the

Debtor moves forward with its restructuring.

## III.    THE COURT SHOULD GRANT A TEMPORARY RESTRAINING ORDER TO PROMPTLY EFFECTUATE THE RELIEF SOUGHT BY THE DEBTOR.

The Debtor requests that this Court enter a temporary restraining order to enjoin

the Securities Claimants from prosecuting the Securities Claims following an expedited,

emergency summary hearing.  This would preserve the status quo until the Court has the

opportunity to hold a further hearing on the Debtor's requested relief under section 105(a) of the

Bankruptcy Code.  The Court has authority to issue a temporary restraining order pursuant to

Rule 65(b) of the Federal Rules of Civil Procedure, which is made applicable to this adversary

proceeding by Bankruptcy Rule 7065.[8]  Upon filing, the Debtor will have provided notice to the

---

[8]    Although Civil Rule 65(c) requires the posting of a bond as a prerequisite to a preliminary injunction, Bankruptcy Rule 7065 exempts an application made by a debtor, trustee or debtor in possession from the bond requirement.  Fed. R. Bankr. P. 7065.

named Securities Claimants in the Securities Action orally and through service of this Motion

and the related Complaint.  The Debtor thus requests that the Court schedule a summary hearing

for a temporary restraining order on an expedited, emergency basis.  *See* 13 James Wm. Moore

et al., *Moore's Federal Practice – Civil* § 65.31 (3d ed. 2021) ("A temporary restraining order

may be granted . . . after a summary hearing with notice." (citation omitted)).

A temporary restraining order is properly granted where it is necessary to prevent

immediate and irreparable injury pending a hearing upon a motion for an injunction.  *Id.* § 65.36.

For the reasons detailed above, the facts here satisfy the requirements for a temporary restraining

order.  A denial of the Debtor's request for a temporary restraining order pending a hearing on

the Debtor's request for injunctive relief would thus cause the very harm that this filing seeks to

prevent.

Litigation is active in the Securities Action as of the date of filing of this Motion.

The last three fact-witness depositions of current or former J&J companies witnesses are

currently scheduled for March 8, 9, and 18, 2022.  Ex. 5.  Third party depositions are scheduled

for the end of March, and more may be scheduled for April.  Other outstanding discovery

requests remain pending—some of which may lead to further motion practice before the district

court.  And certain critical motions remain pending before the district court, including a motion

for class certification.  To protect its interests, the Debtor must thus monitor this litigation, which

will require the time and attention of key Debtor personnel, diverting estate resources away from

reorganization efforts.  Kim Decl. ¶ 15.

More significantly, the continued prosecution of the Securities Claims against the

Third-Party Securities Defendants risks significant, immediate, and irreversible harm to the

Debtor and its estate.  The Court's denial of the Motions to Dismiss the Chapter 11 Case, and its

granting of the Debtor's request for a preliminary injunction with respect to the Talc Claims,

created a critical opportunity for the Debtor and its stakeholders to commence mediation with a

view to achieving a consensual and equitable resolution of this case for the benefit of all.

Allowing the Securities Claimants to march forward with their efforts to establish in another

forum in the same jurisdiction the same disputed facts with respect to their Securities Claims that

are at the heart of the Talc Claims would disturb the momentary environment for negotiation

created by this Court's efforts and would jeopardize the Debtor's attempts to resolve this Chapter

11 Case.  Thus, the Court should enter a temporary restraining order bringing an immediate halt

to all proceedings in the Securities Action to avoid immediate harm to this Chapter 11 Case and

to allow the Debtor and its stakeholders to maximize the opportunity presented to them.

The N.C. Bankruptcy Court has previously issued a temporary restraining order

enjoining litigation as to third parties to avoid any immediate and irreparable harm to the Debtor

and its estate.  Order (Oct. 26, 2021), Adv. Pro. No. 21-03032, ECF No. 28.  Similarly, under the

circumstances here, immediate temporary injunctive relief is appropriate and required to

safeguard the Debtor's prospects for a successful reorganization.

Although temporary restraining orders generally are limited to 14 days, before

that period expires and for good cause, this Court may extend its order for an additional 14 days.

Fed. R. Civ. P. 65(b)(2).  After holding the summary hearing, the Debtor requests that the Court

(i) for good cause, enter a temporary restraining order extending for the maximum period

allowed under Civil Rule 65, which is 28 days; and (ii) set a hearing on the other relief requested

in this Motion on or before that date.

## **CONCLUSION**

For the reasons discussed above, the Debtor requests that the Court enter an order

preliminarily enjoining the Securities Claimants' continued prosecution of the Securities Action

while the Debtor's Chapter 11 Case remains pending.[9]  A proposed form of order granting the Debtor's request for injunctive relief is attached hereto as Exhibit A.

Further, the Debtor respectfully requests that the Court enter an order, substantially in the form attached hereto as Exhibit B, temporarily restraining the Securities Claimants from continuing to prosecute any Securities Claim against any of the Third-Party Securities Defendants until the Court has had an opportunity to hold a hearing on the Debtor's other requested relief.

---

[9]    This injunction includes, without limitation:  (a) the pursuit of discovery from the Third-Party Securities Defendants or their officers, directors, employees or agents; (b) the enforcement of any discovery order against the Third-Party Securities Defendants; and (c) further motions practice related to the foregoing.

Dated: March 7, 2022

**WOLLMUTH MAHER & DEUTSCH LLP**

*/s/ Paul R. DeFilippo*
Paul R. DeFilippo, Esq.
James N. Lawlor, Esq.
Lyndon M. Tretter, Esq. (*pro hac vice*)
Joseph F. Pacelli, Esq. (*pro hac vice*)
500 Fifth Avenue
New York, New York 10110
Telephone: (212) 382-3300
Facsimile: (212) 382-0050
pdefilippo@wmd-law.com
jlawlor@wmd-law.com
ltretter@wmd-law.com
jpacelli@wmd-law.com

**JONES DAY**
Gregory M. Gordon, Esq.
Brad B. Erens, Esq.
Dan B. Prieto, Esq.
Amanda Rush, Esq.
2727 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 220-3939
Facsimile: (214) 969-5100
gmgordon@jonesday.com
bberens@jonesday.com
dbprieto@jonesday.com
asrush@jonesday.com
(Admitted *pro hac vice*)

ATTORNEYS FOR DEBTOR