# EXHIBIT 2

**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | |
|---|---|
| In re | Chapter 11 |
| LTL MANAGEMENT LLC,[1] | Case No. 21-30589 (JCW) |
| Debtor. | |

**DECLARATION OF JOHN K. KIM**
**IN SUPPORT OF FIRST DAY PLEADINGS**

John K. Kim, being first duly sworn, deposes and states as follows:

1.      I am the Chief Legal Officer of LTL Management LLC, a North Carolina limited liability company (the "Debtor") and the debtor in the above-captioned chapter 11 case.  I have held this position with the Debtor since its formation on October 12, 2021.

2.      I am employed by Johnson & Johnson Services, Inc. ("J&J Services"), a non-debtor affiliate of the Debtor and a subsidiary of the Debtor's ultimate non-debtor parent company, Johnson & Johnson ("J&J").  Just prior to my role as the Chief Legal Officer of the Debtor, I was J&J's Assistant General Counsel, Practice Group Lead for the Product Liability Litigation Group.  In that role, I was responsible for product liability litigation globally.  I began my employment with J&J and its affiliates in 2001 as a Senior Counsel in the Litigation Group, handling a variety of cases ranging from commercial disputes and international arbitrations to product liability litigation.

3.      Prior to my employment with J&J and its affiliates, I was associated with the law firm of Simpson Thacher & Bartlett in its Litigation Group from 1989 to 2001, where I

---

[1]      The last four digits of the Debtor's taxpayer identification number are 6622.  The Debtor's address is 501 George Street, New Brunswick, New Jersey 08933.

handled a number of complex litigation engagements, including bankruptcy proceedings, anti-trust disputes, insurance coverage arbitrations and securities actions.

4.      I earned a Juris Doctor degree from Fordham University School of Law in 1989 and a Bachelor of Arts degree from Tufts University in 1985.

5.      On the date hereof (the "Petition Date"), the Debtor filed a voluntary petition with this Court for relief under chapter 11 of the Bankruptcy Code, as well as certain motions and other pleadings (collectively, the "First Day Pleadings").

6.      I submit this Declaration to support the First Day Pleadings and provide certain information about the Debtor, its decision to commence this chapter 11 case and its objectives for this case.  I have reviewed each of the First Day Pleadings, and it is my belief that the relief sought therein is necessary to (a) avoid immediate and irreparable harm to the Debtor, (b) maximize and preserve the value of the Debtor's chapter 11 estate, (c) assist in the smooth transition of the Debtor into chapter 11 and/or (d) promote the efficient administration of this case.

7.      As the Chief Legal Officer, I am familiar with the Debtor's day-to-day operations, assets, financial condition, business affairs and books and records.  Except as otherwise indicated, all facts and statements set forth in this Declaration are based upon:  (a) my personal knowledge; (b) information supplied to me by other members of the Debtor's management, professionals or employees; (c) my review of relevant documents; and/or (d) my opinion based upon my experience and knowledge of the Debtor's assets, liabilities and financial condition.  If called upon to testify, I could and would testify to the facts and opinions set forth herein.

-2-

8.    Section I of this Declaration provides an overview of the Debtor's history and corporate structure. Section II describes the corporate restructuring that was completed on October 12, 2021. Section III describes the circumstances surrounding the commencement of this chapter 11 case and the Debtor's objectives for this case. Section IV sets forth relevant facts in support of the First Day Pleadings.

## I.    THE DEBTOR'S HISTORY AND CORPORATE STRUCTURE

9.    The Debtor traces its roots back to Johnson & Johnson Baby Products Company ("J&J Baby Products"), a New Jersey company incorporated in 1970 as a wholly-owned subsidiary of J&J.

10.    J&J, a New Jersey company incorporated in 1887, first began selling JOHNSON'S® Baby Powder in 1894, launching its baby care line of products. In 1972, J&J established a formal operating division for its baby products business, which included JOHNSON'S® Baby Powder. In 1979, J&J transferred all its assets associated with the Baby Products division to J&J Baby Products. In connection with this transfer, J&J Baby Products assumed all liabilities associated with the Baby Products division. Following this transaction, J&J no longer manufactured or sold baby products, including JOHNSON'S® Baby Powder.

11.    In 1981, J&J Baby Products transferred all its assets, except those assets allocated to its diaper programs, to Omni Education Corporation ("Omni"), a wholly-owned subsidiary of J&J Baby Products. In turn, Omni assumed all liabilities of J&J Baby Products except those liabilities related to its diaper program. Immediately following the transaction, J&J Baby Products merged into another subsidiary of J&J and was renamed Personal Products Company, and Omni changed its name to Johnson & Johnson Baby Products Company.[2]

---

[2]    In 1989, Personal Products Company changed its name to McNeil-PPC, Inc.

12. In 1988, Johnson & Johnson Baby Products Company transferred all its assets in respect of its baby products business to Johnson & Johnson Dental Products Company, which assumed all of its liabilities and was renamed Johnson & Johnson Consumer Products, Inc.

13. In 1997, Johnson & Johnson Consumer Products, Inc. changed its name to Johnson and Johnson Consumer Companies, Inc. ("J&J Consumer Companies").

14. In 2015, J&J Consumer Companies merged with and into an affiliate, which then merged into McNeil-PPC, Inc. The resulting entity was renamed Johnson & Johnson Consumer Inc. (including all former names and historical forms, "Old JJCI").

15. Following these intercompany transactions, Old JJCI became responsible for all claims alleging that JOHNSON'S® Baby Powder and other talc-containing products cause cancer or other diseases.

16. In 2021, Old JJCI implemented a corporate restructuring (the "2021 Corporate Restructuring"), which was completed on October 12, 2021. As a result of that restructuring: Old JJCI ceased to exist and two new entities were created: (a) the Debtor in this case, which was initially formed as a Texas limited liability company and then converted into a North Carolina limited liability company; and (b) another entity, which was initially formed as a Texas limited liability company and then merged into a New Jersey corporation that was its direct parent (as well as the direct parent of the Debtor), whereupon this entity changed its name to "Johnson & Johnson Consumer Inc." ("New JJCI"). As a result of the 2021 Corporate Restructuring, the Debtor holds certain of Old JJCI's assets and is solely responsible for the talc-related liabilities of Old JJCI and New JJCI holds all other assets of Old JJCI and is solely responsible for all other liabilities of Old JJCI.

17.     New JJCI is the direct parent of the Debtor; and the Debtor is the direct parent of Royalty A&M LLC ("Royalty A&M"), a North Carolina limited liability company. A chart depicting the Debtor's corporate structure is attached to this Declaration as Annex 1.

18.     The Debtor was formed to manage and defend thousands of talc-related claims and to oversee the operations of its subsidiary, Royalty A&M. Royalty A&M owns a portfolio of royalty revenue streams, including royalty revenue streams based on third-party sales of LACTAID®, MYLANTA® / MYLICON® and ROGAINE® products. It plans to review royalty monetization opportunities in the Healthcare industry and grow its business by reinvesting the income from these existing royalty revenue streams into both the acquisition of additional external royalty revenue streams as well as financings to third parties secured by similar royalty streams.

19.     New JJCI manufactures and sells a broad range of products used in the baby care, beauty, oral care, wound care and women's health care fields, as well as over-the-counter pharmaceutical products. The Debtor's ultimate parent company, J&J, is a holding company that through its operating subsidiaries conducts business in virtually all countries in the world, focused primarily on products related to human health and well-being. J&J is a global innovator and leader in public health and has been at the forefront of healthcare innovation for over 130 years. That innovation includes novel oncology, immunology and vaccine products, including its COVID-19 vaccine that it developed and supplied at non-profit pricing. J&J's shares of common stock are publicly traded under the symbol JNJ on the New York Stock Exchange.

## II.     THE 2021 CORPORATE RESTRUCTURING

20.     As described above, Old JJCI and its affiliates have engaged in multiple restructurings through the years to achieve business and operational objectives. Since it was

formed in 1970, Old JJCI has merged with other companies, been repositioned in its corporate family and acquired and transferred a number of assets.

21.    Most recently, Old JJCI implemented the 2021 Corporate Restructuring to enable the Debtor to globally resolve talc-related claims through a chapter 11 reorganization without subjecting the entire Old JJCI enterprise to a bankruptcy proceeding.  A key objective of this restructuring was to make certain that the Debtor has the same, if not greater, ability to fund the costs of defending and resolving present and future talc-related claims as Old JJCI did prior to the restructuring.  This was achieved through the establishment of a funding agreement between the Debtor, on the one hand, and J&J and New JJCI (on a joint and several basis) on the other, which is in addition to the value of and revenues generated by Royalty A&M, the Debtor's wholly-owned operating subsidiary.

22.    The 2021 Corporate Restructuring was effectuated through a series of steps.  On October 11, 2021, Old JJCI organized Royalty A&M as a direct subsidiary and, in exchange for full ownership of Royalty A&M's equity, contributed to it $367.1 million. Subsequently, Royalty A&M used those funds to acquire certain royalty streams from Old JJCI and certain of its affiliates.  That same day, the following transactions were effected, in sequence:

- Old JJCI's then-direct parent, Janssen Pharmaceuticals, Inc., organized Currahee Holding Company Inc. ("Currahee"), contributing to it all of the issued and outstanding stock of Old JJCI, whereupon Currahee became the direct parent of Old JJCI; and

- Currahee organized Chenango Zero LLC, a Texas limited liability company, as its wholly owned subsidiary.

23.     On October 12, 2021, the remaining transactions in the 2021 Corporate

Restructuring occurred in the following sequence:

- Old JJCI merged with and into Chenango Zero LLC, with Chenango Zero

  LLC as the surviving entity;

- J&J and Currahee, as payors (on a joint and several basis), and Chenango

  Zero LLC, as payee, entered into a funding agreement (as amended from

  time to time, the "Funding Agreement");

- Old JJCI effected a divisional merger under Chapter 10, Subchapter A of

  the Texas Business Organizations Code;

  ▪     Upon the effectiveness of the divisional merger, (a) Old JJCI

  ceased to exist; (b) two new Texas limited liability companies—Chenango

  One LLC and Chenango Two LLC—were created; and (c) all of the assets

  and liabilities of Old JJCI were allocated between Chenango One LLC and

  Chenango Two LLC, as described below;

- Immediately following the effectiveness of the divisional merger,

  (a) Chenango One LLC and Chenango Two LLC entered into certain

  agreements, including a divisional merger support agreement that, among

  other things, provides that Chenango One LLC will indemnify and hold

  harmless Chenango Two LLC and its affiliates for any losses, liabilities or

  other damages relating to claims against Chenango Two LLC and its

  affiliates in respect of the assets and liabilities of Chenango Two LLC,

  including talc-related liabilities and (b) Chenango One LLC entered into

certain agreement with other affiliates, including the secondment and services agreements discussed further below;

- Following the effectiveness of the divisional merger, (a) Chenango Two LLC merged with and into Currahee, with Currahee as the surviving entity, which then changed its name to "Johnson and Johnson Consumer Inc."; and (b) Chenago One LLC converted from a Texas Limited liability company into a North Carolina limited liability company and changed its name to "LTL Management LLC";

- Among its agreements with non-debtor affiliates, the Debtor entered into a divisional merger support agreement with New JJCI (which was initially entered into between Chenango One LLC and Chenango Two LLC immediately after the divisional merger) that, among other things, provides that the Debtor will indemnify and hold harmless New JJCI and its affiliates for any losses, liabilities or other damages relating to claims against New JJCI and its affiliates in respect of the Debtor's assets or liabilities, including the Debtor's talc-related liabilities; and

- Finally, the Funding Agreement, the divisional merger support agreement and the other intercompany agreements, including the secondment and services agreements discussed further below (which were initially entered into between Chenango One LLC and non-debtor affiliates prior to the divisional merger), were amended and restated to reflect the names of

the parties to those agreements at the conclusion of the 2021 Corporate Restructuring.[3]

24.     Pursuant to the divisional merger, the Debtor became solely responsible for Old JJCI's liabilities arising from talc-related claims against it (other than claims for which the exclusive remedy is provided under a workers' compensation statute or similar laws), and the defense of those claims.  In addition, the Debtor received the following assets:

   (a)   A bank account and approximately $6 million in cash;

   (b)   Old JJCI's rights and interests as payee under the Funding Agreement;

   (c)   All contracts of Old JJCI related to its talc-related litigation, including settlement agreements, interests in qualified settlement trusts, indemnity rights, service contracts and engagement and retention contracts, if any;

   (d)   All equity interests in Royalty A&M;

   (e)   Causes of action that relate to the assets and liabilities allocated to the Debtor;

   (f)   Privileges that relate to the assets and liabilities allocated to the Debtor; and

   (g)   Records that relate to the assets and liabilities allocated to the Debtor.

25.     Pursuant to the divisional merger, the predecessor to New JJCI received all other assets and liabilities of Old JJCI, and became solely responsible for those other liabilities.

26.     As I mentioned above, the design of the 2021 Corporate Restructuring ensures that the Debtor has at least the same, if not greater, ability to fund talc-related claims and

---

[3]     A copy of the Funding Agreement in effect as of the Petition Date (without its Schedule 2 that includes confidential bank account information) is attached hereto as Annex 2.  The summary of the terms of the Funding Agreement in this Declaration is provided for the convenience of the Court and parties in interest and is qualified in all respects by the more detailed terms contained in the Funding Agreement.

other liabilities as Old JJCI had before the restructuring.  The Debtor received the equity of

Royalty A&M, which the Debtor has projected will generate approximately $50 million in

revenue per year over the next five years.  The Debtor estimates the fair market value of its

interest in Royalty A&M to be approximately $367.1 million as of the Petition Date.  In addition,

as noted, as part of the 2021 Corporate Restructuring, the Debtor received $6 million in cash and

became party to the Funding Agreement with New JJCI and J&J.  In total, therefore, the

Debtor's value is approximately $373.1 million, without taking into account the Funding

Agreement with New JJCI and J&J.

   27. Significantly, the Funding Agreement imposes no repayment obligation on

the Debtor; it is not a loan.  It obligates New JJCI and J&J, on a joint and several basis, to

provide funding, up to the full value of New JJCI, to pay for costs and expenses of the Debtor

incurred in the normal course of its business (a) at any time when there is no bankruptcy case and

(b) during the pendency of any chapter 11 case, including the costs of administering the

chapter 11 case, in both situations to the extent that any cash distributions received by the Debtor

from Royalty A&M are insufficient to pay such costs and expenses.  In addition, the Funding

Agreement requires New JJCI and J&J to, up to the full value of New JJCI, fund amounts

necessary (a) to satisfy the Debtor's talc-related liabilities at any time when there is

no bankruptcy case and (b) in the event of a chapter 11 filing, to provide the funding for a trust,

in both situations to the extent that any cash distributions received by the Debtor from Royalty

A&M are insufficient to pay such costs and expenses and further, in the case of the funding of a

trust, the Debtor's other assets are insufficient to provide that funding.

   28. In addition, J&J and New JJCI have committed to fund as early as

January 31, 2022 a North Carolina trust (the "QSF Trust") that will constitute a "qualified

settlement fund" with an aggregate amount of $2 billion for the payment of current and future

talc-related claims asserted against or related to the Debtor.  These funds will be dedicated

exclusively for use in paying such claims.  Although J&J and JJCI have no obligation to make

this contribution, they have agreed to do so as a pre-funding of Permitted Funding Uses (as such

term is defined in the Funding Agreement) under the Funding Agreement.  The funds in the QSF

Trust will be immediately available for the Debtor's eventual use when and as needed to resolve

its talc-related claims.

   29. To ensure that the Debtor has access to services it needs to effectively

operate its business, in connection with the 2021 Corporate Restructuring, the Debtor entered

into a services agreements (the "Services Agreements") with J&J Services.  Pursuant to

the Services Agreement, J&J Services has agreed to provide the Debtor with certain corporate

and administrative services, including treasury and procurement, corporate finance, accounting,

human resources, information technology, legal, risk management, tax and other support

services.  In addition, the Debtor and J&J Services entered into a secondment agreement

pursuant to which J&J Services has agreed to second to the Debtor certain of its employees,

including the Debtor's Chief Legal Officer, on a full-time basis to manage the Debtor's business.

   30. Royalty A&M similarly has agreements it needs to conduct its business.

In particular, Royalty A&M has entered into a services agreement with J&J Services pursuant to

which J&J Services has agreed to provide certain corporate and administrative services and an

intercompany loan facility agreement with J&J.  Under the loan facility agreement, Royal A&M

has the ability to borrow up to $50 million from J&J on terms consistent with those provided to

other J&J affiliates.  In addition, Royalty A&M has entered into a services agreement with the

Debtor pursuant to which the Debtor will provide ongoing access to and support from the

Debtor's chief executive officer and chief financial officer (in their capacities as officers of Royalty A&M) to perform their roles as such, including supporting Royalty A&M's operations, tracking, administering and auditing any royalty streams or other sources of income, and providing strategic planning and analysis, including to seek out opportunities to invest in additional external royalty revenue streams.

### III. EVENTS LEADING TO THE COMMENCEMENT OF THIS CASE AND THE DEBTOR'S OBJECTIVES FOR ITS CHAPTER 11 REORGANIZATION

#### A. Cosmetic Talc Litigation Against the Debtor

31.     As described more fully in the *Informational Brief of LTL Management LLC* (the "Informational Brief"), filed concurrently with this Declaration, this chapter 11 case has been precipitated by the filings of thousands of cosmetic talc lawsuits against Old JJCI and J&J.  The Debtor believes, for the reasons set forth in the Informational Brief, that these claims have no valid scientific basis, as Old JJCI's talc products never contained asbestos and the safety of cosmetic-grade talc has been confirmed by dozens of peer-reviewed studies and multiple regulatory and scientific bodies for decades.  Nevertheless, the number of claims has continued to increase, and the Debtor anticipates that the litigation and its associated burdens will continue for decades more.

32.     Cosmetic talc litigation against the Debtor, Old JJCI and J&J focused primarily on JOHNSON'S® Baby Powder as the purported cause of ovarian cancer and mesothelioma.  JOHNSON'S® Baby Powder has been used by hundreds of millions of people worldwide for over 125 years.

33.     The Debtor traces its history to J&J's Baby Products business that was acquired by Old JJCI from J&J in 1979.  Old JJCI continued to sell these talc-based products following this acquisition.  On May 19, 2020, Old JJCI announced it would permanently

discontinue its line of talc-based Baby Powder in the U.S. and Canada. The decision was based on business considerations, including lack of sales due to misinformation about the safety of Old JJCI's talc-based Baby Powder.

34.     Prior to 2010, only a small number of isolated cases involving cosmetic talc had been filed against Old JJCI and J&J. These cases alleged a range of claims, including talcosis due to substantial misuse of Johnson's Baby Powder, mesothelioma, dermatitis, and rashes.

35.     The number of claims began to skyrocket after the *Berg* (2013) and *Fox* (2016) trials. *Berg v. J&J*, filed in December 2009, was the first case alleging ovarian cancer as a result of genital exposure to Old JJCI's cosmetic talc-based products. The jury found for the plaintiff, but awarded no damages. By the end of 2015, there were over thirteen hundred ovarian cancer lawsuits filed against Old JJCI and J&J.

36.     In February 2016, the first St. Louis ovarian cancer case, *Fox*, went to trial. The jury awarded the plaintiff $72 million dollars. While ultimately overturned on appeal, the verdict sparked even more interest on the part of plaintiff lawyers. Five more cases were tried in that venue over the next year and a half, resulting in plaintiff verdicts totaling more than $235 million dollars (in addition to a defense verdict and a mistrial). All of those verdicts subsequently were reversed on appeal.

37.     New filings alleging that JOHNSON'S® Baby Powder caused mesothelioma also dramatically increased. At the time of the *Fox* trial, there were only six mesothelioma cases naming Old JJCI or J&J as a defendant and alleging JOHNSON'S® Baby Powder as a cause of the plaintiff's disease. Within two months of the *Fox* trial, that number had increased to 23 mesothelioma cases. By the beginning of 2017, more than 100 mesothelioma

-13-

cases had been filed naming Old JJCI or J&J as a defendant.  The number of mesothelioma cases
steadily grew in the years that followed

**B.**     **The Costs and Burdens of the Cosmetic Talc Litigation**

38.     Prior to the Petition Date, roughly 1,300 ovarian cancer and over 250
mesothelioma cases were dismissed without payment, and Old JJCI achieved 16 key defense
verdicts, including in four trials in 2021 alone.  Old JJCI also succeeded in obtaining reversals of
many plaintiff verdicts on appeal.  Despite these results, Old JJCI was also subject to a number
of plaintiff verdicts involving unpredictable and wildly divergent compensatory and punitive
damages awards.

39.     Notably, all of the ovarian cancer plaintiff verdicts to date have been
reversed on appeal with the exception of *Ingham.*  Although the verdict in that case was reversed
in part and reduced, the total damages award was still $2.243 billion.  The St. Louis, Missouri
trial court had improperly permitted the consolidation of 22 ovarian cancer plaintiffs, 17 of
whom were non-residents, for a single trial.  The jury found defendants Old JJCI and J&J liable
for every claim.  The jury awarded compensatory damages in the aggregate amount of $550
million and punitive damages in the aggregate amount $4.1 billion.  On appeal, the punitive
damages award was later reduced to $1.6 billion.

40.     Prior to the commencement of this case, Old JJCI incurred nearly
$1 billion in defending personal injury lawsuits relating to alleged talc exposure, nearly all of
which was spent in only the last five years.  In the months prior to the Petition Date, Old JJCI
was paying anywhere from $10 million to $20 million in defense costs on a monthly basis.  In
addition to these costs, Old JJCI paid approximately $3.5 billion in indemnity in connection with
settlements and verdicts.

41. Cosmetic talc litigation against the Debtor was anticipated to continue for decades more and grow, as were the extraordinary costs of defending and resolving tens of thousands of expected claims. Beyond the sudden influx of ovarian cancer claims, plaintiffs were filing mesothelioma claims, alleging in the case of mesothelioma claims that Old JJCI's cosmetic talc products contained asbestos, which the Debtor disputes. Plaintiff experts estimate that the latency period for mesothelioma can be as long as 60 years and have begun to allege extended latency periods for ovarian cancer allegedly caused by asbestos exposure. As a result, even though Old JJCI stopped selling its talc-based JOHNSON'S® Baby Powder in North America in 2020, individuals who develop mesothelioma in 2080 and beyond could sue the Debtor, potentially drawing out the litigation to the end of this century.

42. As of the Petition Date, there were approximately 38,000 ovarian cancer cases pending against the Debtor, including approximately 35,000 cases pending in a federal multi-district litigation in New Jersey, and approximately 3,300 cases in multiple state court jurisdictions across the country.

43. Moreover, the number of ovarian cancer cases skyrocketed. In 2014, Old JJCI was served with 46 ovarian cancer complaints. In 2017—just three years later—that number was nearly 5,000. This acceleration in ovarian cancer claims asserted against Old JJCI showed no signs of abating. As of the Petition Date, Old JJCI had been served with over 12,300 ovarian cancer complaints in just the first ten and a half months of 2021.

44. In addition to the ovarian claims, more than 430 mesothelioma cases were pending against the Debtor on the Petition Date. These claims, like the ovarian cancer claims, spanned the U.S. with cases pending in New Jersey, California, Illinois, Missouri, New York, and Ohio.

45.     The Debtor expects that, absent its bankruptcy filing, thousands of
additional ovarian cancer and mesothelioma cases would have been filed against it for decades to
come.

**C.     The Debtor's Insurance Coverage and Related Litigation**

46.     The Debtor believes it has insurance coverage for its talc-related
liabilities.  In particular, the Debtor has access to certain primary and excess liability insurance
policies that cover, among other things, defense and/or indemnity costs related to talc bodily
injury claims, subject to the terms of the policies.[4]  I provide below a general overview of the
Debtor's insurance coverage.

47.     Aetna Casualty and Surety Company ("<u>Travelers</u>")[5] issued primary
general liability policies to J&J (which policies cover the Debtor) for the period 1957 to 1980
(the "<u>Travelers Policies</u>").  The combined limits of the Travelers Policies (not accounting for
deductibles or erosion/exhaustion of limits) total more than $214 million per occurrence and
$293 million in the aggregate.  The deductibles increase over time, starting at a minimal level
and increasing to $5 million per occurrence by 1977.  The limits of the Travelers Policies before
1973 are not eroded by defense costs; under later policies, defense costs erode limits.

48.     From 1957 to 1985, Travelers also provided excess liability coverage to
J&J that covers the Debtor.  The combined aggregate limits of those policies total approximately
$563 million.

49.     From 1973 to 1985, a variety of other insurers issued excess policies that
cover the Debtor.  Those insurers include subsidiaries or affiliates of the following companies:

---

[4]     The policies that cover the Debtor were issued to J&J as the Named Insured.  Those policies cover the
period when Old JJCI was operated as a business unit of J&J, as well as during the period when Old JJCI
was a subsidiary of J&J.

[5]     Aetna Casualty and Surety Company is now part of Travelers Insurance Company.

American International Group, Allstate Insurance Company, The Hartford, Home Insurance

Company, Nationwide Indemnity Company, and North River Insurance Company. The

combined limits of those excess policies total more than $1.09 billion in the aggregate. Certain of

the insurers that issued these excess policies are insolvent (including, in particular, Home

Insurance Company).

50.     From 1981 to 1985, American Motorists Insurance Company ("AMICO")

issued primary coverage that covers the Debtor (the "AMICO Policies"). AMICO is insolvent,

having been placed into liquidation in 2013. The Debtor currently believes that the applicable

limits of the AMICO Polices were exhausted by payments made by AMICO on claims while it

was still solvent.

51.     From 1973 through 1985, Middlesex Insurance Company ("Middlesex"), a

captive insurance company that is a wholly-owned subsidiary of J&J, issued policies that cover

J&J and the Debtor. Those policies insured J&J and Old JJCI for large deductibles under the

Travelers Policies and the AMICO Policies. From 1977 to 1985, Middlesex also issued excess

insurance policies that cover J&J and Old JJCI. After 1985, Middlesex issued liability coverage

to J&J and the Debtor. As described below, there is a dispute between J&J, the Debtor, and

Middlesex, on the one hand, and the third-party insurers (i.e., insurers other than the Middlesex

captive), on the other hand, regarding the applicability and extent of coverage the Middlesex

policies provide, as well as the potentially applicable Middlesex coverage limits, including in

particular with respect to post-1985 Middlesex policies.

52.     In total, the limits of solvent primary and excess insurance policies issued

to J&J by third-party insurers that potentially cover talc-related liabilities are in excess of

$1.95 billion.

53. J&J and Old JJCI tendered talc-related claims to the third-party insurers. To date, none of those insurers has acknowledged its coverage obligations, defended Old JJCI or J&J, paid its costs of defense, or indemnified J&J or Old JJCI for settlements or judgments. Instead, the third-party insurers have asserted coverage defenses.

54. In May 2019, certain of the Debtor's third party insurers filed a lawsuit against Old JJCI and J&J, along with Middlesex, in the Superior Court of Middlesex County (Docket No. MID-L-003563-19) (the "New Jersey Coverage Action"), seeking a declaratory judgment regarding the parties' respective obligations under the plaintiff insurers' policies including, in particular, the plaintiff insurers' duties to pay defense and indemnity costs to, among other things, Old JJCI. The insurer plaintiffs filed a Second Amended Complaint on June 22, 2020, which is currently the operative complaint. J&J, Old JJCI, and Middlesex filed answers to the Second Amended Complaint on July 31, 2020, and asserted counterclaims, as well as cross-claims against certain defendants. Travelers and certain other insurers filed Cross-Claims against J&J, Old JJCI, and Middlesex, to which J&J, Old JJCI, and Middlesex responded later in 2020. The New Jersey Coverage Action remains pending.

D. **Chapter 11 Filings by Talc Suppliers**

55. In February 2019, Old JJCI's talc supplier, Imerys Talc America, Inc. and two of its affiliates, Imerys Talc Vermont, Inc. and Imerys Talc Canada, Inc. (collectively, "Imerys") filed voluntary petitions under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Imerys Bankruptcy"). Imerys has potential liability for personal injury claims arising from exposure to talc it sold to customers, including Old JJCI. In its bankruptcy case, Imerys has contended that it has claims against Old JJCI and J&J for indemnification and joint insurance proceeds. The Debtor and J&J dispute those claims.

56.     Cyprus Mines Corporation and its parent company (together, "Cyprus"),
which had owned certain Imerys talc mines, filed in the Imerys Bankruptcy an adversary
proceeding against Old JJCI, J&J, Imerys Talc America, Inc. and Imerys Talc Vermont, Inc.
seeking a declaration of indemnity under certain contractual agreements.  The Debtor and J&J
deny that any indemnification is owed.  In February 2021, Cyprus Mines Corporation filed its
own voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States
Bankruptcy Court for the District of Delaware.

57.     In July 2021, Imerys Talc America, Inc. and Imerys Talc Vermont, Inc.
filed an adversary proceeding against Old JJCI and J&J in the Imerys Bankruptcy seeking
declaratory judgments with respect to certain indemnity agreements with Imerys.  The Debtor
and J&J contest the claims in the adversary complaint.

E.     **The Decision to File This Case**

58.     After consideration of the cost, burden, uncertainty and anticipated
duration of the cosmetic talc litigation, the Debtor determined that the filing of a chapter 11 case
in this Court was prudent and necessary.  The Debtor further concluded that this chapter 11 case
offered the only alternative for equitably and permanently resolving all current and future talc-
related claims against it.  As I described above, Old JJCI was the subject of a virtual tidal wave
of claims during the last five years and the significant number of claims that were being filed
against it were anticipated to continue unabated, if not increase, for decades more.  In addition,
the lottery-like results of the litigation created substantial uncertainty and were inhibiting
Old JJCI's ability to fully focus on its business operations.

59.     The Debtor's goal in this case is to negotiate, obtain approval of and
ultimately consummate a plan of reorganization that would, among other things, (a) establish and
fund a trust to resolve and pay current and future talc-related claims and (b) provide for the

issuance of an injunction that will permanently protect the Debtor, its affiliates and certain other

parties from further talc-related claims arising from products manufactured and/or sold by

Old JJCI, or for which Old JJCI may otherwise have had legal responsibility, pursuant to

sections 105(a) and/or 524(g) of the Bankruptcy Code.

60.     The Debtor is prepared to commit the necessary resources to reach an

agreement with representatives of current and future claimants on a fair and equitable plan of

reorganization as soon as possible.  In that regard, the Debtor seeks to engage in good faith

negotiations to reach a consensual resolution of this chapter 11 case with representatives for

current and future claimants as soon as they are appointed and willing to begin discussions.

### F.     Automatic Stay of Prosecution of Talc-Related Claims

61.     As I discussed above, as a result of the 2021 Corporate Restructuring the

Debtor became responsible for all of Old JJCI's talc-related liability related in any way to injury

or damage, or alleged injury or damage, sustained or incurred in the purchase or use of, or

exposure to, talc, including talc contained in any product, or to the risk of, or responsibility for,

any such damage or injury, except for any liabilities for which the exclusive remedy is provided

under a workers' compensation statute or act ("Talc-Related Liabilities").  As I understand it,

because any claims in respect of Talc-Related Liabilities against Old JJCI (which no longer

exists) would be efforts to recover on account of claims against the Debtor, they are

automatically stayed under the Bankruptcy Code.  See Aldrich Pump LLC v. Those Parties to

Actions Listed on Appendix A to Complaint (In re Aldrich Pump LLC), 2021 WL 3729335, at

*30-32 (Bankr. W.D.N.C. Aug. 23, 2021); DBMP LLC v. Those Parties Listed on Appendix A

to Complaint (In re DBMP LLC), 2021 WL 3552350, at *27-28 (Bankr. W.D.N.C. Aug. 11,

2021).

62.     It is my further understanding that any such talc-related claims (collectively, the "Debtor Talc Claims") are likewise automatically stayed as to other parties. Aldrich Pump, 2021 WL 3729335, at *30-32; DBMP, 2021 WL 3552350, at *27-28.  In particular, any claims that seek to hold third parties liable for the Debtor Talc Claims—such as fraudulent transfer, alter ego and successor liability—are property of the Debtor's estate and subject to the automatic stay.  Aldrich Pump, 2021 WL 3729335, at *31-32; DBMP, 2021 WL 3552350, at *28.

63.     Claims that seek to recover against insurers who have provided insurance to the Debtor are subject to the automatic stay.  Aldrich Pump, 2021 WL 3729335, at *32. Similarly, the assertion of the Debtor Talc Claims against J&J or its non-debtor affiliates is also automatically stayed.  These claims would deplete available insurance coverage that J&J and its non-debtor affiliates share with the Debtor.  In addition, I understand that actions against parties who share such an identity of interests with the debtor that the debtor is, in effect, the real-party defendant are likewise automatically stayed.  The Debtor owes indemnity or is otherwise responsible or otherwise agreed to be responsible or is alleged to be contractually responsible for the Debtor Talc Claims asserted against J&J or any of its non-debtor affiliates, retailers who sold Old JJCI's talc-containing products and certain other parties.  In view of these agreements and obligations, I believe that such an identity of interests exists.  Aldrich Pump, 2021 WL 3729335, at *30-31; DBMP, 2021 WL 3552350, at *27.

## IV.    FIRST DAY PLEADINGS

64.     Concurrently with the filing of this chapter 11 case, the Debtor filed First Day Pleadings requesting various forms of relief.

65.     The Debtor will move for entry of an order scheduling an expedited hearing on certain of the First Day Pleadings.[6]  The Debtor anticipates that the Court will conduct a hearing (the "First Day Hearing") as soon after the commencement of its chapter 11 case as the Court's schedule will permit, at which the Court will hear and consider certain of the First Day Pleadings.  The Debtor also anticipates that the Court will consider the remainder of the First Day Pleadings at a later time.  The First Day Pleadings that the Debtor anticipates will be heard at the First Day Hearing are described in Section IV.A and IV.B, below.  The remaining First Day Pleadings are described in Section IV.C, below.

66.     Generally, the purpose of the First Day Pleadings is to:  (a) obtain authorization for the continued use of the Debtor's bank account; (b) obtain authorization to establish and fund a qualified settlement fund; and (c) establish procedures for the smooth and efficient administration of this chapter 11 case.  I have reviewed each of the First Day Pleadings, including the exhibits thereto, and I believe that the relief sought in each of the First Day Pleadings is tailored to meet the goals described above and, ultimately, will be critical to the Debtor's ability to achieve a successful reorganization.

A.     **The Case Administration Motions**

*Appointment of Claims, Noticing and Voting Agent*

67.     The Debtor will seek the entry of an order appointing Epiq Corporate Restructuring, LLC ("Epiq") as claims, noticing and ballot agent in this chapter 11 case.  I understand that Epiq may, among other things:  (a) prepare and serve all notices required in the Debtor's chapter 11 case, including the notice of the commencement of this case and the meeting of creditors pursuant to section 341 of the Bankruptcy Code; (b) maintain the official

---

[6]     Capitalized terms used below in the descriptions of the First Day Pleadings and not otherwise defined herein have the meanings given to them in the applicable First Day Pleadings.

claims register; and (c) assist with the mailing and tabulation of ballots in connection with any

vote to accept or reject any plan or plans proposed in this chapter 11 case. Two engagement

proposals were obtained and reviewed to ensure selection through a competitive process. The

Debtor submits, based on all engagement proposals obtained and reviewed, that Epiq's rates are

competitive and reasonable given Epiq's quality of services and expertise.

### *Entry of an Order Establishing Certain Notice, Case Management and Administrative Procedures*

68. The Debtor will request that the Court enter an order establishing certain

notice, case management and administrative procedures (collectively, the "Case Management

Procedures") to facilitate the orderly administration of the Debtor's chapter 11 case while

ensuring that appropriate notice is provided to parties who express an interest in the chapter 11

case and those directly affected by a request for relief.

69. The Debtor believes that implementation of the Case Management

Procedures, among other things, will facilitate service of Court Filings and Orders in a manner

that will maximize the efficiency and orderly administration of the chapter 11 case, ensure that

appropriate notice is provided to parties in interest and alleviate the significant administrative

burden and cost that otherwise could be imposed on the Debtor's estate, parties in interest,

the Court and the Clerk of Court due to (a) the substantial number of parties in interest expected

to be involved and (b) the number of Court Filings anticipated in the Debtor's chapter 11 case.

### *List of the Top Law Firms With Talc Cases Against the Debtor in Lieu of the List of the 20 Largest Unsecured Creditors and Notice Procedures for Talc Claimants*

70. I understand that the Top 20 List primarily would be used by

the Bankruptcy Administrator to understand the types and amounts of unsecured claims against

the debtor and thus evaluate prospective candidates to serve on an official committee in the

debtor's case. I further understand that an official committee of talc claimants is expected to be

appointed.  Because committees in mass tort chapter 11 cases typically consists of plaintiff law firms acting on behalf of individual talc claimants, the Debtor will seek authority to file and provide the Bankruptcy Administrator with a list of the 30 law firms with the most significant representations of claimants, based on the volume of filings or other related factors, across the major types of claims faced by the Debtor (a "Top Talc Counsel List"), in lieu of listing the individual talc claimants with the largest unsecured claims against the Debtor on a "Top 20" list of unsecured creditors.  The Debtor believes that providing the Bankruptcy Administrator with a Top Talc Counsel List would better facilitate the Bankruptcy Administrator's evaluation of members of an official committee of talc claimants.

71.     The Debtor also will seek Court approval for certain notice procedures relating to individuals (collectively, the "Talc Claimants") who are claimants in talc-related personal injury lawsuits or other proceedings involving the Debtor, including to (a) serve all notices, mailings, filed documents and other communications relating to its chapter 11 case, including, without limitation, pleadings, in any contested matter or otherwise, seeking relief that could directly impact Talc Claimants' rights and obligations in this chapter 11 case, on Talc Claimants in care of their counsel (collectively, the "Talc Firms") at such counsel's address, as further described in the Motion; and (b) list the names, addresses and other contact information, as applicable, of the Talc Firms in any creditor or service lists, including the creditor matrix provided to the Court or filed in this case, in lieu of listing the contact information of individual Talc Claimants.  To date, the Debtor has communicated solely with the Talc Firms regarding the talc-related claims against the Debtor.  The Debtor in many cases cannot be sure that it has the current addresses (or any addresses) for the Talc Claimants.  Further, consistent with the rules of professional conduct, communicating with an adversary in litigation generally is conducted

through counsel.  The Debtor therefore believes that providing notice to Talc Claimants through the Talc Firms, in accordance with past practice, is much more reliable and consistent with the rules of professional conduct.

72.     The notice procedures proposed in the Motion provide for an effective and appropriate noticing process for the Talc Claimants.  Further, implementing the proposed Notice Procedures would alleviate the administrative burden and expense of gathering current contact information for each of the Talc Claimants, which, in many cases, is not readily available or is difficult to verify.  The Debtor has access to the names and addresses of the counsel for the Talc Claimants (including counsel of record in pending lawsuits), but the names and addresses of a significant number of individual Talc Claimants themselves are not readily available.  It would be extremely burdensome, costly and time-consuming for the Debtor to attempt to obtain this information.  In addition, any contact information for the individual Talc Claimants the Debtor has or is able to obtain may be outdated and unreliable.  Consequently, providing notice in this chapter 11 case in accordance with the Notice Procedures will be more efficient and reliable than providing notice to the individual Talc Claimants directly.

### Extension of Time to File Schedules

73.     The Debtor believes it will need additional time beyond the time period allotted under the Bankruptcy Code to assemble all of the information necessary to complete and file the required schedules of assets and liabilities and statement of financial affairs (collectively, the "Schedules").  The Debtor will need the additional time because of (a) the size and complexity of this chapter 11 case and (b) the volume of materials that must be compiled and reviewed by the Debtor's limited staff to complete the Schedules during the hectic early days of this restructuring.  Because the Debtor's chapter 11 case will involve tens of thousands of

claimants and other parties in interest, it is my understanding that the Debtor would need to collect, review and assemble a substantial amount of information to complete the Schedules.

74.    Given (a) the large number of claimants and (b) the critical matters that the Debtor and its professionals were required to address prior to the commencement of this chapter 11 case, the Debtor was not in a position to complete the Schedules by the Petition Date, even with the assistance of professionals.  The Debtor further estimates that, with the many critical matters to be addressed in the early days of this case, the Debtor will require more than 14 days after the Petition Date to complete the Schedules.

75.    The additional time requested is important to help ensure that the Schedules are as accurate as possible.  Given the volume of information that is provided in the Schedules, and the fact that the information must be accurate as of the Petition Date, additional time to complete the Schedules will help ensure that the relevant information is fully collected and evaluated and can be incorporated into the relevant filings.  Rushing to complete the Schedules soon after the Petition Date, on the other hand, could compromise their completeness.  Accordingly, the Debtor will seek to extend the deadline by which it must file its Schedules to 46 days after the Petition Date, which is November 29, 2021, without prejudice to the Debtor's right to seek a further extension for cause.

### B.    Request to Continue Using Bank Account and Related Relief

76.    The Debtor will seek approval of the continued use of its prepetition bank account, as well as authority to open and close bank accounts during the chapter 11 case, as necessary or appropriate.  In the ordinary course of business, the Debtor maintains a bank account at Bank of America in Charlotte, North Carolina (the "Bank Account").  All payments and other funds that are received by the Debtor are deposited into that account, including cash payments from New JJCI and J&J under the Funding Agreement.  The Bank Account also serves

as a disbursement account and is used to pay all of the Debtor's costs and expenses, including professional fees.

77.     In addition, the Debtor will request authority for Bank of America, and any other bank to charge, and the Debtor to pay or honor, both prepetition and postpetition service and other fees, costs, charges and expenses to which a bank may be entitled under the terms of and in accordance with its contractual arrangements with the Debtor.  Further, the Debtor will request that the Court authorize Bank of America and any other bank to charge back returned items to the Bank Account in the ordinary course of business.  The Debtor requires this relief to minimize disruption to its Bank Account and to assist in accomplishing a smooth transition to, and operation in, chapter 11.

78.     The Bank Account is insured by the United States through the Federal Deposit Insurance Corporation (the "FDIC") and is maintained at Bank of America, a large, well-known and well-capitalized institution.  Therefore, the Debtor will seek a waiver of section 345(b) of the Bankruptcy Code in this case to the extent that the funds maintained in the Bank Account or any other domestic accounts during this chapter 11 case exceed the amount insured by the FDIC or the Federal Savings & Loan Insurance Corporation.

79.     To protect against the possible inadvertent payment of prepetition claims, the Debtor will advise Bank of America not to honor checks issued prior to the Petition Date, except as otherwise expressly permitted by an order of the Court and directed by the Debtor. The Debtor has the capacity to draw the necessary distinctions between prepetition and postpetition obligations and payments without closing the Bank Account and opening a new one.

80.     In the ordinary course of its business, the Debtor uses certain business forms (collectively, and as they may be modified, the "Business Forms").  The Debtor will

request that it not be required to include the legend "D.I.P.," or any other debtor in possession

designation, and the corresponding bankruptcy case number, on its Business Forms because such

alteration is not necessary in this case. The Debtor has few business relationships, and the

parties it conducts business with (such as law firms) are expected to be well aware of the

Debtor's status as a debtor in possession.

### C. **Anticipated First Day Pleadings to Be Heard at a Later Hearing**

***Establishment of a Qualified Settlement Fund for Payment of Talc Claims***

81.     As mentioned above, and to promote a prompt resolution of this

chapter 11 case and avoid unnecessary litigation regarding any alleged harm suffered by

claimants as a result of the 2021 Corporate Restructuring, the Debtor will seek approval of the

establishment and funding of the QSF Trust, which J&J and New JJCI have agreed to fund under

the Funding Agreement as early as January 31, 2022. The QSF Trust will constitute a "qualified

settlement fund" and will be funded with an aggregate amount of $2 billion to resolve or satisfy

current and future talc-related claims asserted against or related to the Debtor but excluding any

such claims pursuant to which amounts will be paid or incurred to, or at the direction of, any

government or governmental entity (collectively, the "QSF Talc Claims").

82.     By agreeing to fund the QSF Trust at this time, New JJCI and J&J are

committing to provide funding when they are not required to do so under the Funding

Agreement. The funding of the QSF Trust will be considered as pre-funding for Permitted

Funding Uses (as such term is defined in the Funding Agreement) and treated as a Payment (as

such term is defined in the Funding Agreement) for all purposes.   In addition, to the extent

permissible under the terms of the Trust Agreement, a Permitted Funding Use, including funding

for a Talc Trust included in a chapter 11 plan in the Chapter 11 Case, shall first be paid by the

disbursement of funds from the QSF Trust to the full extent such funds are available therefor

before additional funds are sought by the Debtor under the Funding Agreement for such

Permitted Funding Use.  The establishment of the QSF Trust will not otherwise affect the

Debtor's rights or J&J's and New JJCI's obligations under the Funding Agreement in any way.

83.     The Debtor believes that establishing the QSF Trust by Court order will be

beneficial to all parties.  Specifically, it will (a) benefit the Debtor and the talc claimants by

placing a significant amount of funds in an irrevocable trust for the benefit of holders of QSF

Talc Claims and (b) as with most qualified settlement funds, benefit the direct or indirect owners

of the Debtor by giving rise to certain tax benefits.  Although the same funding from J&J and

New JJCI would be available to the Debtor in the future under the Funding Agreement even

without this arrangement, obtaining and segregating $2 billion now (a) should eliminate any

doubt regarding the Debtor's financial ability to pay legitimate claims, (b) will assist in funding

any Talc Trust set forth in a chapter 11 plan of reorganization in this chapter 11 case and

(c) inures to the benefit of talc claimants and the Debtor's estate.

### *Motion to Seal Confidential Commercial Information in Connection with QSF Motion*

84.     In connection with the QSF Motion, the Debtor attached the Trust

Agreement establishing the QSF Trust as a North Carolina trust without the Fee Agreement,

which establishes the amount and terms of the Trustee's compensation, as an exhibit.  The

Debtor understands that while the Trust Agreement requires the disclosure of certain information

with respect to the Trustee's compensation and any expense reimbursement on an annual basis,

the Trustee considers the specific terms of the Fee Agreement to be confidential and proprietary

commercial information.  Disclosure of such information could result in competitive harm to the

Trustee.  As a result, the Debtor will request authorization to file the Fee Agreement under seal

and will further request that, to the extent a hearing is held on the QSF Motion that requires the

disclosure of the terms of the Fee Agreement, any such portion of the hearing be conducted <u>in</u> <u>camera</u>.

### *Procedures for Engaging Ordinary Course Professionals*

85.     The Debtor will call upon certain professionals in the ordinary course of its business (the "<u>Ordinary Course Professionals</u>") to provide professional services to assist the Debtor's members and management in the performance of their duties and responsibilities in the ordinary course of the Debtor's business.  These Ordinary Course Professionals provide valuable assistance in addressing issues of importance to the Debtor and its business in connection with the management of the Debtor's talc litigation.

86.     The Debtor desires to employ the Ordinary Course Professionals, as and when requested by the Debtor, to render professional services to its estate in the same manner and for the same general purposes as such services were provided to Johnson & Johnson Consumer Inc. prior to the Petition Date.  To avoid potential disruptions, it is important that the Debtor has the ability to employ the Ordinary Course Professionals (<u>e.g.</u>, for defense counsel, to provide services related to the cases they have been defending), many of whom are familiar with the Debtor's history, business and affairs, including the thousands of pending litigation matters.

87.     Although the Ordinary Course Professionals identified to date are counsel in talc litigation that I understand is expected to remain stayed under section 362 of the Bankruptcy Code, services from these professionals may be needed from time to time. For example, the Debtor may require services in talc litigation relating to filing stay notices, addressing potential stay violations, monitoring dockets and providing information about these cases that is not available from any other source.  However, without assurance that the Debtor is authorized to use and pay these parties, I believe that many Ordinary Course Professionals may

be reluctant to assist the Debtor when needed.  Therefore, the Debtor will request approval of

certain procedures for the engagement and compensation of Ordinary Course Professionals.

## **CONCLUSION**

88.     For all the reasons described herein and in the First Day Pleadings,

I respectfully request that the Court grant the relief requested in each of the First Day Pleadings.


Dated:  October 14, 2021                              */s/ John K. Kim*_____
                                                        John K. Kim

# **ANNEX 1**

Debtor's Corporate Structure Chart

**Organizational Structure of LTL Management LLC**





**ANNEX 2**

Funding Agreement

# AMENDED AND RESTATED FUNDING AGREEMENT

This AMENDED AND RESTATED FUNDING AGREEMENT, dated October 12, 2021 (as it may be amended, restated, modified or supplemented from time to time, this "Agreement"), is by and among JOHNSON & JOHNSON, a New Jersey corporation ("J&J"), JOHNSON & JOHNSON CONSUMER INC., a New Jersey corporation ("JJCI"), and LTL MANAGEMENT LLC, a North Carolina limited liability company ("LTL").

## RECITALS

A.      On the date hereof, but prior to the execution of this Agreement, in contemplation of the divisional merger (the "Divisional Merger") of Chenango Zero LLC, a Texas limited liability company ("Chenango"), pursuant to Chapter 10 of the Texas Business Organizations Code, J&J and Currahee Holding Company Inc., a New Jersey corporation ("Currahee"), as payors, and Chenango, as payee, executed and delivered a funding agreement dated as of October 12, 2021 (the "Original Funding Agreement").

B.      Immediately following the execution and delivery of the Original Funding Agreement, Currahee, in its capacity as the sole member of Chenango approved a Plan of Divisional Merger contemplating the Divisional Merger (the "Plan of Divisional Merger").

C.      At the effective time of the Divisional Merger, (1) certain property of Chenango as set forth on Schedule 5(b)(i) to the Plan of Divisional Merger and certain liabilities and obligations of Chenango as set forth on Schedule 5(c)(i) to the Plan of Divisional Merger (collectively, the "Allocated Assets and Liabilities") were allocated to a new Texas limited liability company created upon the effectiveness of the Divisional Merger ("Chenango One"), (2) the remaining property, liabilities and obligations of Chenango were allocated to another new Texas limited liability company created upon effectiveness of the Divisional Merger ("Chenango Two"), and (3) Chenango ceased to exist.

D.      Pursuant to the Original Funding Agreement, J&J and Currahee agreed, on a joint and several basis, to provide funding to Chenango sufficient to pay the costs of operations of Chenango's business and other liabilities and obligations included in the Allocated Assets and Liabilities as and when they become due.

E.      The Allocated Assets and Liabilities included the rights and obligations of Chenango under the Original Funding Agreement, and, at the effective time of the Divisional Merger, pursuant to the terms of the Plan of Divisional Merger, the rights and obligations of Chenango under the Original Funding Agreement were allocated to Chenango One such that, following the effectiveness of the Divisional Merger, Chenango One had assets having a value at least equal to its liabilities and had financial capacity sufficient to satisfy its obligations as they become due in the ordinary course of business, including any Talc Related Liabilities.

F.      Following the Divisional Merger, (1) Chenango One effected a conversion (the "NC Conversion") into a North Carolina limited liability company and changed its name to "LTL Management LLC" and (2) Chenango Two effected a merger (the "TX-to-NJ Merger") with and into Currahee, which changed its name to "Johnson & Johnson Consumer Inc."

G.     Payors and Payee desire to amend and restate the Original Funding Agreement to reflect that the Divisional Merger, the NC Conversion and the TX-to-NJ Merger have occurred and that JJCI, now a New Jersey corporation having the name "Johnson & Johnson Consumer Inc.," and Payee, now a North Carolina limited liability company having the name "LTL Management LLC," are the parties to such agreement.

## AGREEMENT

NOW, THEREFORE, in consideration of the foregoing, the parties hereto agree as follows:

1.     <u>Definitions</u>.  As used in this Agreement, the following terms have the meanings herein specified unless the context otherwise requires:

"<u>Affiliate</u>" of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person.  For purposes of this definition, "control," as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise.  For purposes of this definition, the terms "controlling," "controlled by" and "under common control with" have correlative meanings.

"<u>Agreement</u>" has the meaning specified in the first paragraph hereof.

"<u>Allocated Assets and Liabilities</u>" has the meaning specified in the recitals to this Agreement.

"<u>Bankruptcy Case</u>" means any voluntary case under chapter 11 of the Bankruptcy Code commenced by the Payee in the Bankruptcy Court.

"<u>Bankruptcy Code</u>" means title 11 of the United States Code, as amended from time to time and any successor statute and all rules and regulations promulgated thereunder.

"<u>Bankruptcy Court</u>" means the United States Bankruptcy Court where the Bankruptcy Case is commenced.

"<u>Base Rate</u>" means, for any day, a fluctuating interest rate per annum as shall be in effect from time to time, which rate per annum shall at all times be equal to the Federal Funds Effective Rate in effect from time to time, determined one Business Day in arrears, plus 1/2 of 1% per annum.

"<u>Board</u>" means: (a) with respect to a corporation, the board of directors of the corporation or any committee thereof; (b) with respect to a partnership, the board of directors, the managing member or members or the board of managers, as applicable, of the general partner of the partnership; (c) with respect to a limited liability company, the managing member or members or the board of managers, as applicable, of the limited liability company; and (d) with respect to any other Person, the board or committee of such Person serving a similar function.

"Business Day" means each day other than a Saturday, a Sunday or a day on which banking institutions in Charlotte, North Carolina or at a place of payment are authorized by law, regulation or executive order to remain closed.

"Capital Stock" means: (a) in the case of a corporation, corporate stock; (b) in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of corporate stock; (c) in the case of a partnership or limited liability company, partnership or membership interests (whether general or limited); and (d) any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person; but excluding (in each case of (a) through (d) above) any debt securities convertible into such equity securities.

"Chenango" has the meaning specified in recitals to this Agreement.

"Chenango One" has the meaning specified in the recitals to this Agreement.

"Chenango Two" has the meaning specified in the recitals to this Agreement.

"Contractual Obligation" means, as to any Person, any obligation or similar provision of any security issued by such Person or any agreement, instrument or other undertaking (excluding this Agreement) to which such Person is a party or by which it or any of its property is bound.

"Currahee" has the meaning specified in first paragraph of this Agreement.

"Default" means any event that is, or with the passage of time or the giving of notice or both would be, an Event of Default.

"District Court" means the United States District Court in the district of the Bankruptcy Court.

"Divisional Merger" has the meaning specified in the recitals to this Agreement.

"Event of Default" has the meaning specified in Section 6.

"Federal Funds Effective Rate" means, for any period, a fluctuating interest rate equal for each day during such period to the weighted average of the rates on overnight Federal Funds transactions with members of the Federal Reserve System arranged by Federal Funds brokers, as published for such day (or, if such day is not a Business Day, for the next preceding Business Day) by the Federal Reserve Bank of New York.

"Funding Account" means the account of the Payee listed on Schedule 2 to this Agreement, into which the proceeds of all Payments made under this Agreement shall be deposited, or such other account designated in writing by the Payee to the Payors from time to time.

"Funding Date" has the meaning specified in Section 2(b).

"Funding Request" has the meaning specified in Section 2(b).

"GAAP" means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or such other principles as may be approved by a significant segment of the accounting profession in the United States, in effect from time to time, consistently applied.

"Governmental Authority" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"J&J" has the meaning specified in first paragraph of this Agreement.

"JJCI" has the meaning specified in first paragraph of this Agreement.

"JJCI Value" means the greater of:

    (a)    the fair market value of the businesses and other assets (including equity interests) held by Chenango, as determined (i) immediately prior to the effective time of the Divisional Merger, (ii) assuming the Allocated Assets and Liabilities are not held by Chenango, and (iii) based on the aggregate amount that would be received upon a sale of such businesses and other assets in one or more (as would maximize the aggregate amount) market transactions between prudent parties, acting at arms' length, under no compulsion to act and having reasonable knowledge of relevant information concerning such businesses and other assets; and

    (b)    the sum of:

        (i)    the fair market value of the businesses and other assets (including equity interests) held by Chenango Two or, after the TX-to-NJ Merger, JJCI, as determined (A) as of the applicable calculation date, (B) assuming neither Chenango Two nor, after the TX-to-NJ Merger, JJCI has any obligations under this Agreement, and (C) based on the aggregate amount that would be received upon a sale of such businesses and other assets in one or more (as would maximize the aggregate amount) market transactions between prudent parties, acting at arms' length, under no compulsion to act and having reasonable knowledge of relevant information concerning such businesses and other assets; and

        (ii)    the fair market value of any businesses or other assets (including equity interests) held by Chenango Two or, after the TX-to-NJ Merger, JJCI that, following the effective time of the Divisional Merger and prior to the applicable calculation date, are distributed by Chenango Two or, after the TX-to-NJ Merger, JJCI to its members, as determined (A) at the time of such distribution and (B) based on the aggregate amount that would be received upon a sale of such businesses or other assets in one or more (as would maximize the aggregate amount) market transactions between prudent parties, acting at arms' length,

under no compulsion to act and having reasonable knowledge of relevant information concerning such businesses or other assets.

"LTL" has the meaning specified in the first paragraph of this Agreement.

"NC Conversion" has the meaning specified in the recitals to this Agreement.

"Organizational Documents" means: (a) with respect to any corporation, its certificate or articles of incorporation and bylaws; (b) with respect to any limited liability company, its certificate or articles of formation or organization and operating agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation of such entity.

"Original Funding Agreement" has the meaning specified in the recitals to this Agreement.

"Payee" means LTL Management LLC, a North Carolina limited liability company.

"Payee Affiliate" means any controlled Affiliate of the Payee.

"Payee Material Adverse Effect" means: (a) a material impairment of the rights and remedies of the Payors under this Agreement, or of the ability of the Payee to perform its material obligations under this Agreement; or (b) a material adverse effect upon the legality, validity or enforceability of this Agreement against the Payee.

"Payment" has the meaning specified in Section 2(a).

"Payor Affiliate" means any Affiliate of a Payor, excluding the Payee and any Payee Affiliate.

"Payor Material Adverse Effect" means with respect to a Payor: (a) a material adverse change in, or a material adverse effect upon, the business, assets, liabilities (actual or contingent) or financial condition of such Payor and its Subsidiaries, taken as a whole; (b) a material impairment of the rights and remedies of the Payee under this Agreement, or of the ability of such Payor to perform its material obligations under this Agreement; or (c) a material adverse effect upon the legality, validity or enforceability of this Agreement against such Payor.

"Payors" means J&J and JJCI.

"Permitted Funding Use" means each of the following:

(a)     the payment of any and all costs and expenses of the Payee incurred in the normal course of its business (including the payment of any indemnification or other obligations of the Payee owing to any managers or officers of the Payee) at any time

when there is no proceeding under the Bankruptcy Code pending with respect to the Payee;

(b)      the payment of any and all costs and expenses of the Payee incurred during the pendency of any Bankruptcy Case, including the costs of administering the Bankruptcy Case and any and all other costs and expenses of the Payee incurred in the normal course of its business (including the payment of any indemnification or other obligations of the Payee owing to any managers or officers of the Payee);

(c)      the funding of any amounts to satisfy:

(i)      the Payee's Talc Related Liabilities established by a judgment of a court of competent jurisdiction or final settlement thereof at any time when there is no proceeding under the Bankruptcy Code pending with respect to the Payee;

(ii)      following the commencement of any Bankruptcy Case, the Payee's Talc Related Liabilities in connection with the funding of one or more trusts for the benefit of existing and future claimants created pursuant to a plan of reorganization for the Payee confirmed by a final, nonappealable order of the Bankruptcy Court and, to the extent required, the District Court (for the avoidance of doubt, regardless of whether such plan of reorganization provides that the Payors will receive protection pursuant to section 105 or section 524(g) of the Bankruptcy Code and regardless of whether the Payors support such plan of reorganization); and

(iii)      in the case of either (i) or (ii), any ancillary costs and expenses of the Payee associated with such Talc Related Liabilities and any litigation thereof, including the costs of any appeals;

(d)      the funding of any amounts necessary to cause the Funding Account to contain at least $5,000,000 at such time;

(e)      the funding of any obligations of the Payee owed to any Payor or Payor Affiliate, including any indemnification or other obligations of the Payee under any agreement provided for in the Plan of Divisional Merger; and

(f)      the payment of any and all costs and expenses of the Payee incurred in connection with the pursuit of available remedies to collect any unfunded Payments due and owing to the Payee or otherwise to enforce the performance by the Payors, or either of them, of any provision of this Agreement;

in the case of clauses (a) through (e) above, solely to the extent that any cash distributions theretofore received by the Payee from its Subsidiaries are insufficient to pay such costs and expenses and fund such amounts and obligations in full and further, in the case of clause (c)(ii) above, solely to the extent the Payee's other assets are insufficient to satisfy the Payee's Talc Related Liabilities in connection with the funding of such trust or trusts.

"Person" means any individual, corporation, partnership, limited liability company, joint venture, trust, unincorporated organization, or government or any agency or political subdivision thereof.

"Plan of Divisional Merger" has the meaning specified in the recitals to this Agreement.

"SEC" means the Securities and Exchange Commission.

"Subsidiary" means, with respect to any Person, any other Person a majority of the outstanding Voting Stock of which is owned or controlled by such Person or by one or more other Subsidiaries of such Person and that is consolidated in such Person's accounts.

"Talc Related Liabilities" has the meaning specified in Schedule 1 to this Agreement.

"TX-to-NJ Merger" has the meaning specified in the recitals to this Agreement.

"Voting Stock" of any Person as of any date means the Capital Stock of such Person that is at the time entitled to vote in the election of the Board of such Person.

2.      Funding Obligations and Procedures.

(a)      Funding Obligations.    The Payors hereby agree, on the terms and conditions set forth in this Agreement, upon the request of the Payee from time to time in accordance with the requirements of Section 2(b), to make payments to the Payee (each, a "Payment"), the proceeds of which shall be used by the Payee for a Permitted Funding Use. Nothing in this Agreement shall obligate the Payors to (i) make Payments under this Agreement that in the aggregate exceed the lesser of (A) the JJCI Value and (B) the aggregate amount of all Permitted Funding Uses or (ii) make any individual Payment under this Agreement that exceeds the amount requested by the Payee in the applicable Funding Request.  The JJCI Value shall be calculated at, and only at, any date on which (x) the Payors refuse to make a requested Payment under this Agreement based on clause (i) of the immediately preceding sentence and (y) the Payments made by the Payors under this Agreement prior to such date, together with the requested Payment, are in the aggregate not in excess of the aggregate amount of all Permitted Funding Uses.

(b)      Funding Requests.    To request a Payment, the Payee shall deliver to the Payors a written request (which written request may be a .pdf delivered via email) for such Payment in a form reasonably acceptable to the Payors and signed by the Payee (each, a "Funding Request").    Each Funding Request shall specify (i) the amount of the requested Payment, which shall be no less than $500,000, and (ii) the date of the requested Payment, which shall be the date that is at least five Business Days following the delivery of such Funding Request (each such date, a "Funding Date").    Each Funding Request by the Payee shall constitute a representation and warranty by the Payee that the conditions set forth in Section 2(d) have been satisfied.  Except as required to comply with the minimum requirements in Section 2(b)(i), the Payee shall not deliver a Funding Request for an amount in excess of the aggregate amount necessary for the Payee to fund all current Permitted Funding Uses and all projected Permitted Funding Uses over the 30 days following the date of such Funding Request.

(c)     Payments.  Subject only to the satisfaction of the conditions set forth in Section 2(d), on or before any Funding Date, the Payors shall pay or cause to be paid to the Payee an amount equal to the amount of the requested Payment specified in the applicable Funding Request. All Payments shall be made by wire or other transfer of immediately available funds, in United States dollars, to the Funding Account.  In the event that the Payors do not make any Payment within the time period required by this Section 2(c), the amount of the requested Payment shall bear interest at a rate per annum equal to the Base Rate *plus* 2% until such Payment is made and the Payors shall include any interest accruing pursuant to this Section 2(c) in the next Payment made to the Payee.

(d)     Conditions to Payments.  The Payors' obligation to make any Payment is subject to the satisfaction of the following conditions as of the date of the Funding Request relating to such Payment:  (i) the representations and warranties of the Payee set forth in Section 3(b) shall be true and correct without regard to the impact of any Bankruptcy Case, including any notices or other actions that may be required therein; and (ii) there shall have been no violation by the Payee of the covenant set forth in Section 5.

3.     Representations and Warranties.

(a)     Representations and Warranties of the Payor.  Each Payor represents and warrants to the Payee that:

(i)     Existence, Qualification and Power.  Such Payor (A) is duly organized or formed, validly existing and, as applicable, in good standing under the laws of its jurisdiction of incorporation or organization, (B) has all requisite power and authority and all requisite governmental licenses, authorizations, consents and approvals to (I) own or lease its material assets and carry on its business and (II) execute, deliver and perform its obligations under this Agreement, and (C) is duly qualified and is licensed and, as applicable, in good standing under the laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license; except in each case referred to in clause (B)(I) or (C), to the extent that failure to do so could not reasonably be expected to have a Payor Material Adverse Effect with respect to such Payor.

(ii)     Authorization; No Contravention. The execution, delivery and performance by such Payor of this Agreement has been duly authorized by all necessary corporate or other organizational action, and does not and will not (A) contravene the terms of its Organizational Documents, (B) conflict with or result in any breach or contravention of, or the creation of any lien under, or require any payment to be made under (I) any Contractual Obligation to which it is a party or affecting it or its properties or (II) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which it or its property is subject, or (C) violate any applicable law; except in each case referred to in clause (B) or (C), to the extent the failure to do so could not reasonably be expected to have a Payor Material Adverse Effect with respect to such Payor.

8

(iii)    Governmental Authorization; Other Consents.    No approval, consent, exemption, authorization or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with the execution, delivery or performance of this Agreement by, or enforcement of this Agreement against, such Payor.

(iv)    Binding Effect.    This Agreement has been duly executed and delivered by such Payor.  This Agreement constitutes a legal, valid and binding obligation of such Payor, enforceable against such Payor in accordance with its terms, except to the extent such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally and by equitable principles.

(b)    Representations and Warranties of the Payee.    The Payee represents and warrants to the Payors that:

(i)    Existence, Qualification and Power.    The Payee (A) is duly organized or formed, validly existing and, as applicable, in good standing under the laws of its jurisdiction of incorporation or organization, (B) has all requisite power and authority and all requisite governmental licenses, authorizations, consents and approvals to (I) own or lease its material assets and carry on its business and (II) execute, deliver and perform its obligations under this Agreement and (C) is duly qualified and is licensed and, as applicable, in good standing under the laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license; except in each case referred to in clause (B)(I) or (C), to the extent that failure to do so could not reasonably be expected to have a Payee Material Adverse Effect.

(ii)    Authorization; No Contravention.    The execution, delivery and performance by the Payee of this Agreement has been duly authorized by all necessary corporate or other organizational action, and does not and will not (A) contravene the terms of its Organizational Documents, (B) conflict with or result in any breach or contravention of, or the creation of any lien under, or require any payment to be made under (I) any Contractual Obligation to which it is a party or affecting it or its properties or (II) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which it or its property is subject, or (C) violate any applicable law; except in each case referred to in clause (B) or (C), to the extent the failure to do so could not reasonably be expected to have a Payee Material Adverse Effect.

(iii)    Governmental Authorization; Other Consents.    No approval, consent, exemption, authorization or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with the execution, delivery or performance of this Agreement by, or enforcement of this Agreement against, the Payee.

9

(iv)     Binding Effect.  This Agreement has been duly executed and delivered by the Payee.  This Agreement constitutes a legal, valid and binding obligation of the Payee, enforceable against the Payee in accordance with its terms, except to the extent such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally and by equitable principles.

4.     Covenants of the Payors.

(a)     Provision of Financial Information.

(i)     No later than 90 days after the end of each fiscal year (in the case of annual financial statements) and 60 days after the end of each fiscal quarter other than the last fiscal quarter (in the case of quarterly financial statements), (A) J&J will furnish to the Payee audited annual and unaudited quarterly consolidated financial statements of J&J prepared in accordance with GAAP, subject, with respect to quarterly financial statements, normal year-end audit adjustments, and (B) Currahee will furnish to the Payee unaudited annual and quarterly income statements and balance sheets of Currahee prepared in accordance with GAAP and Currahee's historical cost basis of its subsidiaries, subject to the absence of notes to the financial statements and related disclosures and, with respect to quarterly financial statements, normal year-end adjustments.

(ii)     By accepting such financial information, the Payee will be deemed to have represented to and agreed with the Payor furnishing such financial information that: (A) it will not use the information in violation of applicable securities laws or regulations; and (B) it will not communicate the information to any Person, including in any aggregated or converted form, and will keep the information confidential, other than where disclosure of such information is required by law, regulation or legal process (in which case the Payee shall, to the extent permitted by law, notify such Payor promptly thereof); *provided*, *however*, that the Payee may deliver a copy thereof to counsel for any official committee of claimants and any future claimants' representative appointed in any Bankruptcy Case on a confidential basis under a protective order entered in such Bankruptcy Case.

(iii)     Notwithstanding the foregoing, but subject to the last sentence of this Section 4(a)(iii), the financial information required to be furnished as described in Section 4(a)(i) may be, rather than that of a Payor, those of any direct or indirect parent of such Payor.  Notwithstanding the foregoing, a Payor may fulfill the requirement to furnish such financial information by filing the information with the SEC within the applicable time periods required by the SEC.  Subject to the last sentence of this Section 4(a)(iii), a Payor will be deemed to have satisfied the requirements of Section 4(a)(i) if any direct or indirect parent of such Payor has filed such reports containing the required information with the SEC within the applicable time periods required by the SEC and such reports are publicly available.  To the extent a direct or indirect parent of a Payor furnishes financial information pursuant to the first sentence of this Section 4(a)(iii) or such parent files a report with the SEC pursuant to the third sentence of this Section 4(a)(iii), and if the financial information so furnished relates to such direct or indirect parent of such Payor, the same shall be accompanied by consolidating information that explains in reasonable detail the difference between the information relating to such parent, on the one

hand, and the information relating to such Payor and its Subsidiaries on a standalone basis, on the other hand.

    (b)    <u>Successor to J&J upon Consolidation or Merger</u>.

    (i)    Subject to the provisions of <u>Sections 4(b)(ii)</u> and <u>4(b)(iii)</u>, nothing contained in this Agreement shall prevent any consolidation or merger of J&J with or into any Person, or successive consolidations or mergers in which J&J or its successor or successors shall be a party or parties, or shall prevent any sale, assignment, transfer, lease, conveyance or other disposition of all or substantially all the property of J&J (for the avoidance of doubt, calculated by including any equity interests held by J&J), to any Person; *provided*, *however*, that J&J hereby covenants and agrees, that, if the surviving Person, acquiring Person or lessee is a Person other than J&J, upon any such consolidation, merger, sale, assignment, transfer, lease, conveyance or other disposition, all of J&J's funding obligations under this Agreement and the observance of all other covenants and conditions of this Agreement to be performed by J&J, shall be expressly assumed, by an amendment to this Agreement or such other documentation in form reasonably satisfactory to the Payee executed and delivered to the Payee, by the Person formed by such consolidation, or into which J&J shall have been merged, or by the Person which shall have acquired or leased such property.  This covenant will not apply to (A) a merger of J&J with an Affiliate thereof solely for the purpose of reincorporating J&J in another jurisdiction within the United States, (B) any conversion of J&J from an entity formed under the laws of one state to the same type of entity formed under the laws of another state, or (C) any conversion of J&J from a limited liability company to a corporation, from a corporation to a limited liability company, from a limited liability company to a limited partnership or a similar conversion, whether the converting entity and the converted entity are formed under the laws of the same state or the converting entity is formed under the laws of one state and the converted entity is formed of the laws of a different state.  Notwithstanding the foregoing, this <u>Section 4(b)(i)</u> will not apply to any consolidation or merger, or any sale, assignment, transfer, conveyance, lease or other disposition of assets, between or among J&J and its Subsidiaries.

    (ii)    Upon any consolidation or merger, or any sale, assignment, transfer, lease, conveyance or other disposition of all or substantially all of the assets, of J&J (for the avoidance of doubt, calculated by including any equity interests held by J&J) in a transaction that is subject to, and that complies with, the provisions of the preceding clause (i), the successor Person formed by such consolidation with J&J or into which J&J is merged, or to which such sale, assignment, transfer, lease, conveyance or other disposition is made, shall succeed to, and be substituted for (so that from and after the date of such consolidation, merger, sale, lease, conveyance or other disposition, the provisions of this Agreement referring to J&J, including as a Payor, shall refer instead to the successor Person and not to J&J), and may exercise every right and power of, J&J, including as a Payor, under this Agreement with the same effect as if such successor Person had been named herein.  In the event of a succession in compliance with this <u>Section 4(b)(ii)</u>, the predecessor Person shall be relieved from every obligation and covenant under this Agreement upon the consummation of such succession.

    (iii)    Any consolidation, merger, sale, assignment, transfer, lease, conveyance or other disposition referred to in the preceding clause (i) shall not be permitted

under this Agreement unless immediately after giving effect to such transaction, no Default or Event of Default shall have occurred and be continuing.

5.      <u>Covenants of the Payee</u>.  The Payee shall not use the proceeds of any Payment made under this Agreement for any purpose other than a Permitted Funding Use.  The Payee will perform its indemnification obligations under the agreements provided for in the Plan of Divisional Merger in all material respects, subject, in the event that a proceeding under the Bankruptcy Code is pending with respect to the Payee, to the resulting automatic stay under section 362 of the Bankruptcy Code.

6.      <u>Events of Default</u>.   Each of the following events constitutes an "<u>Event of Default</u>":

(a)     the Payors default in the funding obligations pursuant to <u>Section 2</u> and such default continues for a period of 10 Business Days;

(b)     a Payor defaults in the performance of, or breaches, any covenant or representation or  warranty of such Payor in this Agreement (other than a covenant or representation or warranty which is specifically dealt with elsewhere in this <u>Section 6</u>) and such default or breach continues for a period of 30 days, or, in the case of any failure to comply with <u>Section 4(a)</u> of this Agreement, 60 days, in each case after there has been given, by registered or certified mail, to such Payor by the Payee a written notice specifying such default or breach and requiring it to be remedied and stating that such notice is a "Notice of Default" hereunder;

(c)     a Payor, pursuant to or within the meaning of the Bankruptcy Code or any similar federal or state law for the relief of debtors, (i) commences a voluntary case, (ii) consents to the entry of an order for relief against it in an involuntary case, (iii) consents to the appointment of a custodian of it or for all or substantially all of its property, (iv) makes a general assignment for the benefit of its creditors, or (v) generally is not paying its debts as they become due; and

(d)     a court of competent jurisdiction enters an order or decree under the Bankruptcy Code or any similar federal or state law for the relief of debtors that (i) is for relief against a Payor, (ii) appoints a custodian of a Payor for all or substantially all of the property of a Payor, or (iii) orders the liquidation of a Payor, and, in each case of (i) through (iii) above, such order or decree remains unstayed and in effect for 60 consecutive days.

Upon becoming aware of any Default or Event of Default, a Payor shall promptly deliver to the Payee a statement specifying such Default or Event of Default.

7.      <u>Remedies</u>.   Upon the occurrence of any Event of Default, and at any time thereafter during the continuance of any such Event of Default, the Payee may pursue any available remedy to collect any unfunded Payments due and owing to the Payee or to enforce the performance of any provision of this Agreement.

8.    <u>Notices</u>.    All notices required under this Agreement, including each Funding Request and any approval of or objection to a Funding Request, shall be delivered to the applicable party to this Agreement at the address set forth below.  Unless otherwise specified herein, delivery of any such notice by email, facsimile or other electronic transmission (including .pdf) shall be effective as delivery of a manually executed counterpart thereof.

<u>Payors</u>:

Johnson & Johnson
One Johnson & Johnson Plaza
New Brunswick, NJ 08933
Attention:  Michelle Ryan, Treasurer
Email:  mryan1@its.jnj.com

Johnson & Johnson Consumer Inc.
199 Grandview Road
Skillman, NJ 08558
Attention:  Michelle Goodridge, President
Email:  mgoodrid@its.jnj.com

<u>Payee</u>:

LTL Management LLC
501 George Street
New Brunswick, NJ 08933
Attention:  Robert Wuesthoff, President
Email:  rwhuestho@its.jnj.com

with a copy to:

LTL Management LLC
501 George Street
New Brunswick, NJ 08933
Attention:  John Kim, Chief Legal Officer
Email:  JKim8@its.jnj.com

9.    <u>Governing Law; Submission to Jurisdiction</u>.  This Agreement shall be governed and construed in accordance with the laws of the State of North Carolina.  Any legal proceeding seeking to enforce any provision of, or based on any matter arising under, this Agreement may be brought: (a) at any time there is not a proceeding under the Bankruptcy Code pending with respect to the Payee, in state or federal court in Charlotte, North Carolina; or (b) at any time there is a proceeding under the Bankruptcy Code pending with respect to the Payee, in the Bankruptcy Court.  Each Payor and the Payee hereby irrevocably and unconditionally submit to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such legal proceeding.

10. <u>No Implied Waiver; Amendments</u>. No failure or delay on the part of the Payee to exercise any right, power or privilege under this Agreement, and no course of dealing between the Payors, or either of them, on the one hand, and the Payee, on the other hand, shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege under this Agreement preclude any other or further exercise thereof or the exercise of any other right, power or privilege. No notice to or demand on the Payors, or either of them, in any case shall entitle the Payors, or either of them, to any other or further notice or demand in similar or other circumstances, or constitute a waiver of the right of the holder of this Agreement to any other or further action in any circumstances without notice or demand. The remedies provided in this Agreement are cumulative and not exclusive of any remedies provided by law. No amendment or waiver of any provision of this Agreement, nor consent to any departure by the Payee therefrom, shall in any event be effective unless the same shall be in writing, specifically refer to this Agreement, and be signed by the Payors and the Payee, and then such amendment or waiver shall be effective only in the specific instance and for the specific purpose for which given. A waiver on any such occasion shall not be construed as a bar to, or waiver of, any such right or remedy on any future occasion.

11. <u>Counterparts; Entire Agreement; Electronic Execution</u>. This Agreement may be executed in separate counterparts, each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement constitutes the entire contract among the parties hereto relating to the subject matter hereof and supersedes, in its entirety, the Original Funding Agreement and any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. This Agreement shall become effective when it shall have been executed by each party hereto and each party hereto shall have received counterparts hereof which, when taken together, bear the signatures of each of party hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns. Delivery of an executed counterpart of a signature page of this Agreement by telecopy, .pdf or any other electronic means that reproduces an image of the actual executed signature page shall be effective as delivery of a manually executed counterpart of this Agreement.

12. <u>Severability</u>. If any one or more of the provisions contained in this Agreement are invalid, illegal or unenforceable in any respect, the validity, legality or enforceability of all the remaining provisions will not in any way be affected or impaired. If any one or more provisions contained in this Agreement are deemed invalid, illegal or unenforceable because of their scope or breadth, such provisions shall be reformed and replaced with provisions whose scope and breadth are valid under applicable law.

13. <u>Transfer; Assignment</u>. This Agreement shall be binding upon each Payor and its successors and assigns, and the terms and provisions of this Agreement shall inure to the benefit of the Payee and its successors and assigns. A Payor's rights and obligations under this Agreement may not be assigned without the prior written consent of the Payee; <u>*provided*</u>, <u>*however*</u>, that no such consent of the Payee shall be required in connection with any transfer effectuated in compliance with <u>Section 4(b)</u>. The Payee's rights and obligations under this Agreement may not be assigned without the prior written consent of the Payors. Any purported assignment of rights or obligations under this Agreement other than as permitted by this <u>Section 13</u> shall be null and void.

14

14.     <u>Construction</u>.    The descriptive headings herein are inserted for convenience of reference only and are not intended to be part of or to affect the meaning or interpretation of this Agreement. The word "including" means without limitation by reason of enumeration. The words "hereof," "herein" and "hereunder" and words of similar import, when used in this Agreement, refer to this Agreement as a whole and not to any particular provision of this Agreement. Unless specifically stated otherwise, all references to Sections and Schedules are to the Sections and Schedules of or to this Agreement.

15.     <u>Rights of Parties</u>.    This Agreement shall not confer any rights or remedies upon any Person other than the parties hereto and their respective successors and permitted assigns.

16.     <u>Joint and Several Obligations</u>.    Obligations of the Payors under this Agreement are joint and several.

[<em>Signature Page Follows</em>]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**JOHNSON & JOHNSON**, a New Jersey corporation, as a Payor

By: _____

Michelle Ryan,
Treasurer

**JOHNSON & JOHNSON CONSUMER INC.**, a New Jersey corporation, as a Payor

By: _____

Michelle Goodridge,
President

**LTL MANAGEMENT LLC**, a North Carolina limited liability company, as the Payee

By: _____

Robert Wuesthoff,
President

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**JOHNSON & JOHNSON**, a New Jersey corporation, as a Payor

By: _____

Michelle Ryan,
Treasurer

**JOHNSON & JOHNSON CONSUMER INC.**, a New Jersey corporation, as a Payor

By: *Michelle Woodridge*

Michelle Goodridge,
President

**LTL MANAGEMENT LLC**, a North Carolina limited liability company, as the Payee

By: _____

Robert Wuesthoff,
President

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**JOHNSON & JOHNSON**, a New Jersey corporation, as a Payor

By: _____
      Michelle Ryan,
      Treasurer

**JOHNSON & JOHNSON CONSUMER INC.**, a New Jersey corporation, as a Payor

By: _____
      Michelle Goodridge,
      President

**LTL MANAGEMENT LLC**, a North Carolina limited liability company, as the Payee

By: _____
      Robert Wuesthoff,
      President

# SCHEDULE 1

## Definition of Talc Related Liabilities

For purposes of this Agreement, "Talc Related Liabilities" means all Liabilities (as defined below) of the Payee related in any way to injury or damage, or alleged injury or damage, sustained or incurred in the purchase or use of, or exposure to, talc, including talc contained in any product, or to the risk of, or responsibility for, any such damage or injury, including such Liabilities based on the contamination, or alleged contamination, of talc, including talc contained in any product, with asbestos or any other material.

Capitalized terms that are used in this Schedule 1 have the following meanings:

(a)     "Cause of Action" means any claim, judgment, cause of action, counterclaim, crossclaim, third party claim, defense, indemnity claim, reimbursement claim, contribution claim, subrogation claim, right of set off, right of recovery, recoupment, right under any settlement Contract and similar right, whether choate or inchoate, known or unknown, contingent or noncontingent.

(b)     "Contract" means any contract, agreement, arrangement, lease, indenture, mortgage, deed of trust, evidence of indebtedness, License, Plan, guarantee, understanding, course of dealing or performance, instrument, bid, order, proposal, demand, offer or acceptance, whether written or oral.

(c)     "Governmental Authority" means any national, central, federal, state, provincial, municipal, local or other domestic, foreign or supranational governmental, legislative, administrative or regulatory authority, agency, court, arbitration tribunal, board, department or commission, or other governmental or regulatory entity, including any competent governmental authority responsible for the determination, assessment or collection of taxes.

(d)     "Law" means any national, central, federal, state, provincial, municipal, local or other domestic, foreign or supranational statute, law, ordinance, decree, order, injunction, rule, regulation, directive, constitution, code, edict, writ, judgment, opinion, decree, injunction, stipulation, award or other document or pronouncement having the effect of law (including common law) of any Governmental Authority, including rules and regulations of any regulatory or self-regulatory authority with which compliance is required by any of the foregoing.

(e)     "Liability" shall mean any claim, demand, offer, acceptance, action, suit, liability or obligation of any kind, whether accrued or fixed, absolute or contingent, matured or unmatured, determined or determinable, choate or inchoate, asserted or unasserted, known or unknown, including (i) those arising or that may arise under any past, present or future Law or Contract or pursuant to any Cause of Action or Proceeding and (ii) all claims for economic or noneconomic damages or injuries of any type or nature whatsoever (including claims for physical, mental and emotional pain and suffering, loss

of enjoyment of life, loss of society or consortium and wrongful death, as well as claims for damage to property and punitive damages).

(f)  "License" means any license, sublicense, agreement, covenant not to sue or permission.

(g)  "Person" means any individual, corporation (including any non-profit corporation), general or limited partnership, limited liability company, joint venture, estate, trust, benefit plan, unincorporated organization, business, syndicate, sole proprietorship, association, organization, labor union or other entity or Governmental Authority.

(h)  "Plan" means, with respect to any Person, (i) any "employee benefit plan" (as defined in Section 3(3) of ERISA), (ii) all specified fringe benefit plans as defined in Section 6039(D) of the Internal Revenue Code, and (iii) any other plan, program, policy, agreement or arrangement, whether or not in writing, relating to compensation, employee benefits, severance, change in control, retention, deferred compensation, equity, employment, consulting, vacation, sick leave, paid time off, salary continuation, disability, hospitalization, medical insurance, life insurance, scholarship programs, incentive compensation or bonus compensation, in each case that is sponsored, maintained or contributed to or required to be sponsored, maintained or contributed to by, or otherwise covering, such Person.

(i)  "Proceeding" means any action, appeal, arbitration, assessment, cancellation, charge, citation, claim, complaint, concurrent use, controversy, contested matter, demand, grievance, hearing, inquiry, interference, investigation, litigation (including class actions and multidistrict litigation), mediation, opposition, re-examination, summons, subpoena or suit, or other case or proceeding, whether civil, criminal, administrative, judicial or investigative, whether formal or informal, whether public or private, commenced, brought, conducted or heard by or before, under the supervision or direction of, or otherwise involving, any Governmental Authority or arbitrator or other agreed-upon tribunal or dispute resolution mechanism.