# EXHIBIT 3

# UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| LTL MANAGEMENT LLC,[1] | : | Case No. 21-30589 (JCW) |
| Debtor. | : | |
| | : | |
| LTL MANAGEMENT LLC, | : | |
| Plaintiff, | : | |
| v. | : | Adv. Pro. No. 21-03032 (JCW) |
| THOSE PARTIES LISTED ON APPENDIX A TO COMPLAINT and JOHN AND JANE DOES 1-1000, | : | |
| Defendants. | : | |

### SUPPLEMENTAL DECLARATION OF JOHN K. KIM
### IN SUPPORT OF DEBTOR'S COMPLAINT FOR
### DECLARATORY AND INJUNCTIVE RELIEF AND RELATED MOTIONS

John K. Kim, being first duly sworn, deposes and states as follows:

1. I am the Chief Legal Officer of LTL Management LLC, a North Carolina limited liability company (the "Debtor") and the debtor in the above-captioned chapter 11 case and plaintiff in the above-captioned adversary proceeding. I have held this position with the Debtor since its formation on October 12, 2021.

2. On October 14, 2021 (the "Petition Date"), the Debtor commenced a reorganization case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy

---

[1] The last four digits of the Debtor's taxpayer identification number are 6622. The Debtor's address is 501 George Street, New Brunswick, New Jersey 08933.

Code, as well as filed certain motions and other pleadings (collectively, the "First Day Pleadings") in the Chapter 11 Case. On October 21, 2021, the Debtor commenced the above-captioned adversary proceeding by filing a complaint [Adv. Pro. Dkt. 1] (the "Complaint") and filed the *Debtor's Motion for an Order (I) Declaring the Automatic Stay Applies to Certain Actions Against Non-Debtor or (II) Preliminarily Enjoining Certain Actions Against Non-Debtors and (III) Granting a Temporary Restraining Order Pending a Final Hearing* [Adv. Pro. Dkt. 2] (the "Injunction Motion").

3.  On the Petition Date, I submitted in the Chapter 11 Case, in support of the First Day Pleadings, the *Declaration of John K. Kim in Support of First Day Pleading* [Dkt. 5] (the "First Day Declaration"). The First Day Declaration also supports the Complaint and the Injunction Motion and I incorporate it by reference herein. I now submit this supplemental declaration to provide additional facts in support of the Complaint and the Injunction Motion. Capitalized terms not defined herein have the meanings given to them in the First Day Declaration, the Complaint or the Injunction Motion, as applicable.

4.  The facts and statements set forth in this Declaration are based on: (a) my personal knowledge; (b) information supplied to me by other members of management, professionals or employees; (c) my review of relevant documents; and/or (d) my opinion based upon my experience and knowledge of Old JJCI, J&J, the Debtor and the Debtor Talc Claims. If called upon to testify, I could and would testify to the facts and opinions set forth in this declaration.

## The 1979 Transaction

5.  As detailed in the First Day Declaration, in 1972, J&J established a formal operating division for its baby products business, which included JOHNSON'S® Baby Powder. Effective as of January 1, 1979, J&J transferred all its assets associated with the Baby Products

-2-

division to J&J Baby Products Company, and J&J Baby Products Company assumed all liabilities associated with the Baby Products division. The J&J Board of Directors approved this transaction on December 12, 1978. The relevant portions of the *Minutes of a Regular Meeting of Board of Directors of Johnson & Johnson*, December 12, 1978 reflecting the Board resolution to approve this transaction are attached hereto as Annex A.

6. Even though J&J has not manufactured or sold talc-containing products since prior to 1979, in virtually every lawsuit asserting a Debtor Talc Claim, the Debtor Talc Claim is asserted against both Old JJCI and J&J. In many jurisdictions, the plaintiffs seek to hold Old JJCI and J&J jointly and severally liable for such talc claims. Plaintiffs rarely, if ever, attempt to differentiate between talc sold by J&J and talc sold by Old JJCI and, to my knowledge, have never alleged that only the talc sold by J&J (and not Old JJCI) caused a plaintiff's injury.

7. Prior to the Petition Date, all costs associated with the talc litigation, including defense costs, settlements and any verdict amounts, were ultimately paid by Old JJCI. For administrative convenience, J&J initially paid these costs and then, consistent with the fact that Old JJCI was responsible for all claims alleging that Johnson's Baby Powder and other talc-containing products cause cancer or other disease, Old JJCI was charged for 100% of any amounts paid by J&J through an intercompany charge.

**Retailers and Third Party Indemnities**

8. Old JJCI had relationships with various Retailers who sold Old JJCI's talc-containing products. Old JJCI has agreed to indemnify the Retailers for claims related to the sale of Old JJCI's talc-containing products, and these contractual indemnities were allocated to the Debtor in the 2021 Corporate Restructuring. In addition, to the extent a Retailer is held liable

-3-

for a claim arising out of the products manufactured and/or sold by Old JJCI, and not by independent actions of the Retailers (i.e., such that those claims are Debtor Talc Claims), certain state laws could require the Debtor to indemnify the Retailers for these liabilities.

9. As of the Petition Date, there are some Debtor Talc Claims asserted against the Retailers. Claims asserted against the Retailers for their sale of Old JJCI products are virtually identical to the claims asserted against Old JJCI. I believe these claims against Retailers are generally brought to defeat removal to federal court based on diversity jurisdiction and the Retailers are often dismissed before trial without payment.

10. Old JJCI would periodically accept from Retailers tenders of talc-related claims related to the sale of its products. When a Retailer was sued on a Debtor Talc Claim, the Retailer would notify Old JJCI by submitting a tender request. Old JJCI would then determine whether to accept the Retailer's tender of its defense and indemnify the Retailer pursuant to a tender agreement (each, a "Tender Agreement"). Since 2018, Old JJCI has indemnified and agreed to assume the defense of nearly 600 talc-related claims against the Retailers pursuant to Tender Agreements. Of those tendered claims, about 450 were pending as of the Petition Date.

11. In addition, Old JJCI agreed to indemnify certain other transaction counterparties for liability arising from Debtor Talc Claims. For example, in 2005, Old JJCI entered into an asset purchase agreement with Pharma Tech Industries, Inc. ("PTI" and subsequently PTI Royston, LLC) pursuant to which Old JJCI sold a manufacturing plant (where various products, including certain talc-containing products, were bottled) to PTI, who continued to operate the facility and manufacture certain talc products until early 2020. In connection with the asset sale, Old JJCI and PTI entered into a manufacturing and supply agreement, which was subsequently amended and restated. Under the manufacturing and supply agreement, Old JJCI

agreed to indemnify, and has indemnified, PTI and its affiliates for certain claims related to talc products. The claims against PTI are generally identical to and based on the claims against Old JJCI.

12. In 2012, Old JJCI sold the assets and liabilities relating to certain products, including the Shower to Shower products, to Valeant Pharmaceuticals International, Inc. ("Valeant"). Thereafter, in 2019, Old JJCI and Valeant (now known as Bausch Health Companies Inc.) entered into an indemnification agreement. Pursuant to that indemnification agreement, Old JJCI agreed to indemnify Valeant for personal injury and products liability actions arising from alleged exposure to Shower to Shower products and for certain other regulatory actions arising out of the manufacture, use, or sale of Shower to Shower products, as set forth more fully in the agreement. The Claims against Valeant are generally identical to the claims asserted against Old JJCI.

### The Debtor's Need for the Requested Declaratory and Injunctive Relief

13. As discussed in more detail in the First Day Declaration, the Debtor commenced this Chapter 11 Case to equitably and permanently resolve all current and future talc-related claims against it through the consummation of a plan of reorganization that includes the establishment of a trust. The relief sought by this adversary proceeding is critical to the Debtor's ability to achieve that purpose. Without the requested declaration or injunction, claimants would be permitted to (and in fact, appear to be eager to) litigate, in other forums, the exact same talc claims that are being asserted against the Debtor in this Chapter 11 Case.

14. Following the 2021 Corporate Restructuring and the commencement of this Chapter 11 Case, claimants immediately challenged the application of the automatic stay and threatened to pursue their talc claims against the Protected Parties.

15. Given the statements by counsel to the Defendants to date, absent (a) a declaration or an injunction that enjoins the filing or continued prosecution of Debtor Talc Claims against the Protected Parties and (b) the immediate entry of an order temporarily restraining such filing or continued prosecution, I believe the following actions will occur:

(a) Many Defendants who already have asserted Debtor Talc Claims against the Protected Parties will contend that the automatic stay applies only to the Debtor and will attempt to continue prosecuting such claims against Old JJCI, New JJCI, J&J and the other Protected Parties outside of the Chapter 11 Case;

(b) Many Defendants who have sued only the Debtor will seek to amend their complaints to name one or more of the Protected Parties and prosecute Debtor Talc Claims against those Protected Parties outside of the Chapter 11 Case;

(c) Any Defendants who have pending motions to amend their complaints to add certain of the Protected Parties will continue to pursue those amendments in an effort to proceed with litigation against the Protected Parties outside of the Chapter 11 Case; and

(d) Defendants John and Jane Does 1-1000 will file Debtor Talc Claims against the Protected Parties, particularly Old JJCI and New JJCI, but not the Debtor.

16. Continued prosecution of Debtor Talc Claims against the Protected Parties in the tort system also would irreparably harm the Debtor. First, the Debtor has indemnity obligations that could make judgments against the Protected Parties on those claims tantamount to judgments against the Debtor. In particular, the Debtor has (a) contractual or other obligations to indemnify the Non-Debtor Affiliates if those companies are held liable for Debtor Talc Claims; and (b) contractual indemnification obligations with, or other obligations to, the Retailers and Indemnified Parties relating to products formerly sold by or otherwise associated with the Debtor. These indemnification obligations render the Debtor the real-party defendant in any suit against a Protected Party.

17. Additionally, litigation of the Debtor Talc Claims against the Protected Parties outside of the Chapter 11 Case will create the substantial risk that: (a) resolution of factual and legal issues in that litigation may bind the Debtor through the doctrines of *res judicata* and collateral estoppel; and (b) parties will use statements, testimony and other evidence generated in those proceedings to try to establish Debtor Talc Claims against the Debtor. This risk is particularly acute because, by pursuing the Debtor Talc Claims against the Protected Parties, the Defendants would litigate the same key facts—involving the same products, the same time periods, and the same alleged injuries—related to the talc liabilities of Old JJCI that are at issue with respect to the Debtor Talc Claims asserted against the Debtor.

18. Under these circumstances, it would be imprudent for the Debtor to stand idly by as liability is effectively established against it by Defendants in collateral proceedings. Rather, without immediate injunctive relief, the Debtor will be compelled to pull key estate resources away from its reorganization efforts and actively involve itself in, and defend the litigation, of Debtor Talc Claims against the Protected Parties, even as it attempts simultaneously to move forward with its goal of reorganizing to address these very same claims. On a daily basis, obligations arise and deadlines are imposed in those cases that already have been filed, including in connection with depositions, court appearances and discovery requests. I anticipate these activities would consume my time during the pendency of the Chapter 11 Case if the litigation is not stayed as to all Protected Parties. Thus, permitting talc litigation against the Debtor to continue through tort suits against the Protected Parties outside of this Court would divert me and possibly the Debtor's other personnel from pursuing the reorganization process, impair the Debtor's ability to effectively pursue a plan of reorganization, and effectively deprive the Debtor of the "breathing spell" that I understand is afforded by the automatic stay.

### The Need for Limited Notice to the Defendants in
### Relation to the Issuance of a Temporary Restraining Order

19. Absent immediate injunctive relief through a temporary restraining order, I expect that claims against the Protected Parties, by existing and new talc claimants alike, are likely to increase after the commencement of the Chapter 11 Case and imposition of the automatic stay. As more cases are filed, the risks to, and the burden on, the Debtor will grow. The Debtor requires immediate injunctive relief to prevent the significant harm to its estate that would be caused by continued litigation of the Debtor Talc Claims outside of the Chapter 11 Case.

20. The Debtor is requesting a temporary restraining order on limited notice because it cannot realistically provide effective notice to the many named plaintiffs who have sued or may sue the Protected Parties in the short period of time in which this Court's action is needed. Moreover, notice of this Motion and the Complaint may further exacerbate the very rush-to-the-courthouse created by the notice of the bankruptcy filing, which a temporary restraining order is necessary to further prevent. Further, Defendants John and Jane Does 1-1000 are putative plaintiffs for future talc actions against the Protected Parties and are unknown at this time. The Debtor's sole means of notifying these plaintiffs is through publication.

Dated: October 21, 2021                     */s/ John K. Kim*
                                            John K. Kim

NAI-1522309977

# ANNEX A

Excerpted 1979 Board Minutes

MINUTES OF A REGULAR MEETING

OF BOARD OF DIRECTORS OF

JOHNSON & JOHNSON

DECEMBER 12, 1978

A regular meeting of the Board of Directors of Johnson & Johnson was held at its subsidiary, Ethicon, Inc., Somerville, New Jersey, on Tuesday, December 12, 1978, commencing at 1:30 p.m.

The following persons, constituting a quorum, were present:

| | |
|---|---|
| A. J. Abbruzze | W. J. Haines |
| J. E. Burke | J. J. Heldrich |
| R. E. Campbell | D. D. Johnston |
| D. R. Clare | R. Q. Marston |
| J. G. Cooney | R. B. Sellars |
| V. J. Dankis | H. G. Stolzer |
| F. DeAngeli | V. M. Willaman |

Also present were G. S. Frazza, General Counsel, and W. J. Ryan, Secretary of the Corporation.

In accordance with the By-Laws, Mr. J. E. Burke presided as Chairman of the meeting, and Mr. W. J. Ryan recorded the minutes.

There had been a tour of the Ethicon administrative, manufacturing and research facilities by the Directors prior to the meeting, which was favorably commented upon.

Mr. Abbruzze presented an extended report of his responsibility as a member of the Executive Committee and reviewed the history and operations of the particular operating companies for which he is responsible. These are

JNJTALC000471090

Mr. Ryan then summarized the status of the Technicare acquisition and the proposed registration statement to be filed with the Securities and Exchange Commission which is expected to become effective in approximately one month. Definitive agreements have been executed and will be exchanged within the next few days. The transaction is proceeding generally on schedule with a closing anticipated in late February 1979. Mr. Ryan then reviewed the legal requirements relating to registration statements as well as the responsibility of the Board and individual Directors. The short-term financial status of Technicare and the long-term objective of the acquisition were also discussed.

The next matter to come before the Board related to the incorporation of seven principal operating divisions of Johnson & Johnson effective January 1, 1979 as wholly-owned subsidiaries as follows: Chicopee, Jelco, Johnson & Johnson Baby Products Company, Johnson & Johnson Dental Products Company, Johnson & Johnson Products, Inc. (formerly the Domestic Operating Company), Permacel and Surgikos. The incorporation will be accomplished by a transfer of assets from the divisions to the corporations respectively which will also assume the liabilities of the divisions respectively. In some instances the indebtedness of the division to Johnson & Johnson will be capitalized. In keeping with Johnson & Johnson's long standing policy of decentralization of corporate business, and in light of substantial potential state tax savings, as well as additional legal considerations, the matter has been approved by the Executive Committee in

JNJTALC000471095

June 1978 and reported to the Board on July 27, 1978. Thereupon, after discussion, upon motion duly made, seconded and unanimously carried, the following preambles and resolutions were adopted:

> RESOLVED: that in connection with the transfer of the assets of the operating divisions of the Corporation (Domestic Operating Company, Johnson & Johnson Baby Products Company, Johnson & Johnson Dental Products Company, Jelco Laboratories, Permacel, Chicopee Manufacturing Company and Surgikos) to, and the assumption of the liabilities of the divisions by wholly owned subsidiaries of Johnson & Johnson (respectively, Johnson & Johnson Products, Inc., Johnson & Johnson Baby Products Company, Johnson & Johnson Dental Products Company, Jelco Laboratories, Permacel, Chicopee and Surgikos), the proper officers of this Corporation be and they hereby are authorized to make payment to the aforesaid corporations by credit to an intercompany account of an amount equal to the book value of the net assets (assigned capital plus retained earnings) of each division, in return for the issuance to this Corporation, of a number of shares of each such subsidiary's common stock having an aggregate par value equal to the net assets transferred to it; and further
>
> RESOLVED: that the several subject corporate subsidiaries carry over to their respective balance sheets the retained earnings and assigned capital of each respective predecessor's division, effective 12:01 A.M. the 1st day of January, 1979; and further
>
> RESOLVED: that the proper officers of this Corporation be and they hereby are authorized to subscribe from time to time to such additional number of shares of common stock of each subsidiary at their par value as such officers shall deem advisable; and further
>
> RESOLVED: that with regard to the incorporation of Johnson & Johnson Baby Products Company and Johnson & Johnson Dental Products Company divisions, that the prior existing debt of each division,

JNJTALC000471096

approximately $124,000,000 and $1,400,000, respectively, be forgiven and deemed a contribution to capital of such divisions' respective corporate successor and in return for which such subsidiary shall issue to this Corporation common stock having an aggregate par value equal to such capital contribution; and further

RESOLVED: that as a result of such transfers, that the officers of this Corporation be and they hereby are authorized to withdraw from all states, territories or dependencies of the United States, except for the Commonwealth of Pennsylvania, where registration or qualification is no longer considered by them to be necessary and that the proper officers of this Corporation be and they hereby are authorized to revoke any appointment of agent or attorney for service of process, and to file such certificates, reports, revocations of appointment, or surrender of authority as may be necessary to terminate the authority or qualification of this Corporation to do business in any such state, territory or dependency; and further

RESOLVED: that the proper officers of this Corporation be and they hereby are authorized and directed to do and to cause to be done all such acts and things, and to execute and deliver and to cause to be executed and delivered all such instruments, as they shall deem necessary or proper in order to carry into effect the purposes of the resolutions adopted at this meeting.

Mr. Heldrich next reviewed the commitment of Johnson & Johnson and described the significant efforts to comply with the Federal anti-inflation guidelines for voluntary restraints on wages and prices. A special steering committee comprised of members of the Executive Committee, Corporate Administration, Finance, Government Relations and Law Departments has been formed and has been active in preparing the necessary procedures to comply with the guidelines.

There being no further business to come before the meeting, upon motion duly made, seconded and unanimously carried, the meeting was adjourned.

*William J. Ryan*
William J. Ryan
Secretary

JNJTALC000471103